No. 66,635

BANK IV WICHITA, NATIONAL ASSOCIATION, *et al., Appellants,* v. ARN, MULLINS, UNRUH, KUHN & WILSON, a General Partnership, *et al., Appellees.*

(827 P.2d 758)

Opinion filed February 28, 1992.

*James D. Oliver,* of Foulston & Siefkin, of Wichita, argued the cause, and *Mikel L. Stout* and *Rebekah S. Whiteford,* of the same firm, were with him on the briefs for appellants.

*Alan R. Pfaff,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Darrell D. Kellogg,* of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

SIX, J.: This case involves a nonclient, third-party legal malpractice claim arising from the triangular relationship of borrower, lender, and counsel for the borrower.

The malpractice claim is advanced by Bank IV Wichita, National Association (Bank IV) and Christopher Steel, Inc., (Christopher II) against a law firm, Arn, Mullins, Unruh, Kuhn & Wilson (Arn, Mullins), and two partners of the firm, Milo M. Unruh and Stuart Collier. Bank IV was a major creditor of George C. Christopher & Son, Inc. (Christopher I). Christopher I was a client of Arn, Mullins. Christopher II, a former wholly owned subsidiary of Bank IV, was formed to take possession of the assets of Christopher I and operate the business after Bank IV foreclosed on Christopher I.

The interests of Bank IV and Christopher II merge for the instant appeal. The interests of Arn, Mullins and the two partner defendants, Unruh and Collier, also merge. We shall refer to the two plaintiffs as Bank IV and to the three defendants as Arn, Mullins.

The case comes to us on appeal from a summary judgment order in favor of Arn, Mullins.

Our jurisdiction is based on a transfer from the Court of Appeals under K.S.A. 20-3018(c).

We hold that the legal malpractice claim of Christopher I against Arn, Mullins is not assignable to Bank IV. Bank IV does not acquire the malpractice claim by assignment, foreclosure, subrogation, or successor status. Under the facts of the case at bar, no duty is owing from Arn, Mullins to Bank IV, a nonclient. The trial court is affirmed.

### Facts

Christopher I was engaged in the steel fabrication business. Arn, Mullins had served as Christopher I's counsel for many years. Unruh and Collier, partners at Arn, Mullins, were responsible for handling the legal matters giving rise to the instant lawsuit. Unruh was a member of the board of directors and also corporate secretary of Christopher I.

Arn, Mullins' representation of Christopher I included labor negotiations with the union representing the corporation's employees. The law firm was involved in negotiating a collective

bargaining agreement between Christopher I and the union. A new contract was negotiated in 1985 without the participation of Arn, Mullins. The 1985 contract, which was effective April 1, 1985, and would have expired March 31, 1988, contained a reopender clause allowing the renegotiation of wages to become effective at the end of one year (April 1, 1986). The 1985 contract further provided that upon failure to reach an agreement on renegotiated wages, either party may give notice of intent to terminate the agreement effective April 1, 1986.

In 1986, Christopher I, having experienced financial difficulties, consulted Arn, Mullins concerning the 1985 contract. At Christopher I's request, Arn, Mullins drafted an interim agreement, extending wage negotiations and the right to terminate, which was executed by Christopher I and the union. The parties failed to reach an agreement regarding wages. Christopher I gave written notice of termination to the union under the interim agreement. Deeming itself no longer bound by the contract, Christopher I implemented unilateral wage reductions and began laying off workers in violation of the terms of the union contract.

The union filed unfair labor practice charges in April 1986 against Christopher I with the National Labor Relations Board (NLRB). Arn, Mullins represented Christopher I in the NLRB proceedings.

In August 1987, an NLRB administrative law judge (ALJ) ruled that Christopher I had improperly terminated the union contract by failing to give the Section 8(d)(3) (National Labor Relations Act [NLRA], 29 U.S.C. § 158[d] [3] [1988]) 30-day notice. The 30-day notice should have been given to the Federal Mediation and Conciliation Service and to the Kansas Department of Human Resources. The NLRB's ALJ ordered Christopher I to restore the terms and conditions of the 1985 agreement until 30 days after the § 8(d)(3) notice is given. In addition, Christopher I was ordered to: (1) pay back wages to those employees whose wages had been reduced; (2) reinstate and to pay back wages to those employees who had been laid off in violation of the contract; (3) pay the union any loss of dues; and (4) make pension contributions as required under the 1985 contract.

Christopher I appealed the ALJ's decision to the NLRB. The ALJ's decision was affirmed by the NLRB in July 1988. The

NLRB's ruling was judicially enforced in its entirety. *NLRB v. George C. Christopher & Son, Inc.*, No. 89-9510, unpublished opinion (10th Cir., April 11, 1989).

### The Malpractice Claim

Bank IV alleges Arn, Mullins committed legal malpractice in the representation of Christopher I in the termination of the 1985 union contract and during the unfair labor practice claim. The alleged malpractice is the failure to give or to advise Christopher I to give the 30-day advance termination notice.

Bank IV asserts that after the union filed the unfair labor practice claim, union representatives and the NLRB informed Christopher I and Arn, Mullins that the contract had been improperly terminated. The § 8(d)(3) notice (a one-page form) could have been given at any time and the 1985 union contract would have terminated 30 days after such notice was given. Christopher I's liability for violating the improperly terminated Union contract would have ceased 30 days after the § 8(d)(3) notice was given.

Arn, Mullins took the position that the § 8(d)(3) notice was not required because the union had waived notice by entering into the interim agreement. However, on September 24, 1985, the NLRB had held in *Weathercraft Co. of Topeka,* 276 N.L.R.B. 452, 453 (1985), that:

"Section 8(d) is unequivocal. It provides that the duty to bargain includes serving written notice upon the other party to a collective-bargaining agreement of one's desire to terminate or modify it, with notice also to the Federal Mediation and Conciliation Service and the appropriate state agency.

"Board authority is also unequivocal. Failure of a party desiring to terminate or modify a collective-bargaining agreement to give appropriate notice under Section 8(d)(3) precludes it from altering terms or conditions of the collective-bargaining agreement or engaging in a strike or lockout to enforce its proposed changes. This proscription exists notwithstanding that the expiration date of the agreement has passed. See *Meatcutters Local 576 (Kansas City Chip Steak Co.)*, 140 NLRB 876 (1963); *United Marine Local 333 (General Marine Transportation Corp.)*, 228 NLRB 1107 (1977)."

In addition, the United States Supreme Court has held that the § 8(d)(3) "notice requirement operates wholly independently of whatever notice requirement the parties have fixed for themselves." *Labor Board v. Lion Oil Co.*, 352 U.S. 282, 292-93, 1 L. Ed. 2d 331, 77 S. Ct. 330 (1957). The NLRB relied on *Weath-*

*ercraft* and *Lion Oil* in finding Christopher I had improperly terminated the 1985 contract.

We are reviewing a summary judgment motion. In resolving the case at bar, we deem the allegations of legal malpractice to be true.

## The Loan Transaction

Bank IV entered into a revolving credit agreement with Christopher I, as borrower, in October 1986, while the NLRB claim against Christopher I was pending. The agreement was secured by a real estate mortgage, security interests in substantially all of Christopher I's assets, and stock assignments. The agreement provided for credit of up to $4,750,000, which was fully disbursed. In the credit agreement, Christopher I and each of the guarantors made the following relevant representations and warranties:

"5.05. Litigation. No Litigation or governmental proceedings are pending or threatened against Borrower or any Guarantor, the results of which might materially adversely affect its, his, or her financial condition or operations. Other than any liability disclosed in the financial statements referred to in Section 5.03 hereof, neither Borrower nor any Guarantor has any material contingent liabilities."

"5.09. Compliance. Borrower and each Guarantor is in material compliance with all Laws and regulations applicable to it, including, without limitation, the Employee Retirement Income Security Act of 1974 ('ERISA') insofar as such statute applies to it, him, or her. No condition exists or event or transaction has occurred in connection with any Plan maintained by the Borrower or Amarillo [a guarantor] as defined in Section 407(d)(7) of ERISA which could result in the incurrence by Borrower or Amarillo of any material liability, fine, or penalty."

Arn, Mullins represented Christopher I in negotiating and closing the credit agreement. Unruh, as secretary of Christopher I, certified a copy of the Board of Directors' resolutions authorizing Christopher I to enter into the credit agreement. Unruh, as secretary, also certified that: (1) he was authorized to make and deliver the certificate; (2) the resolutions were in full force and effect; and (3) George C. Christopher II, President, is the authorized agent of Christopher I.

The credit agreement required an "opinion of counsel" to be delivered to Bank IV. The requirements to be included in the opinion letter were specific. Bank IV was to receive counsel's opinion on: matters contained in credit agreement sections 5.13

(corporate existence), 5.14 (partnership status of C & A Investment Company), and 5.15 (authorization). In addition, the opinion letter was to state that: (1) the borrower and guarantors have the power to execute and deliver the loan documents and to perform the obligations of the agreement; (2) no additional approval is required; (3) the agreement and note are not in conflict with any binding agreement of borrower or any guarantor of which counsel has actual knowledge; and (4) the note and other loan documents are legal and binding obligations of the borrower and each guarantor.

Counsel's opinion letter, prepared and submitted by Arn, Mullins, addressed the requirements of the credit agreement.

The section of the credit agreement that specifically listed the content requirements of the opinion letter required by Bank IV neither referred to nor requested counsel's opinion on sections 5.05 "Litigation" and 5.09 "Compliance."

### The Alleged Damages

By the summer of 1987, it was apparent to Christopher I's management and to Bank IV that Christopher I was not going to be able to resolve its financial problems. Christopher I's stock or assets would have to be sold. Christopher I and Arn, Mullins took the position that Bank IV had a duty to sell the company or its assets as a going concern and that any other type of sale would be unreasonable.

A sale contract was negotiated in September 1987 with a group of investors (the Mullen group). The contract provided for a simultaneous transfer of Christopher I's assets to Bank IV and resale to the Mullen group. The Mullen group cancelled the contract, reasoning that certain conditions precedent had either not been satisfied or could not be resolved to the group's satisfaction.

The conditions precedent prior to closing provided for: (1) no misrepresentations or breach of covenants and warranties; (2) minimum values of inventory, cash, and trade receivables; (3) the resolution of all disputes, claims, or controversies involving Christopher I, the union, and the NLRB.

Christopher I ceased operations in September 1987. Bank IV filed an action to foreclose. At the sheriff's sale, Bank IV purchased Christopher I's assets, which had been pledged as security for the credit agreement. Bank IV established a wholly owned

subsidiary, Christopher II (the co-plaintiff in the case at bar), to continue operating the business.

In March 1989, Christopher II's stock was sold to J. S. Materials, Inc. Bank IV alleges the sale to J. S. Materials, Inc., resulted in a loss of approximately $1.3 million compared to the price which Bank· IV was to receive under the Mullen group contract.

In October 1989, the NLRB filed a compliance specification against Christopher I, Bank IV, and Christopher II as a wholly owned subsidiary of Bank IV and later of J. S. Materials, Inc. The NLRB alleged that Bank IV, Christopher II, and J. S. Materials, Inc. were liable to pay back wages, union dues, and pension fund contributions as successors of Christopher I (from the date Christopher I began its unfair labor practices until the date Christopher I ceased operations).

Under the NLRA, successor liability may be imposed on a successor entity for unfair labor practices of the predecessor. The imposition of liability results if the successor had notice of the potential liability and operates the business in a substantially unchanged form. In the sale of Christopher II's stock to J. S. Materials, Inc., Bank IV agreed to defend and indemnify J. S. Materials, Inc., for any liability owed to the NLRB in connection with the labor practices of Christopher I.

The potential successor liability exceeded $500,000. Bank IV ultimately settled the NLRB compliance proceeding for $200,000.

The instant lawsuit was commenced, alleging malpractice in connection with the labor dispute between the union and Christopher I. The petition seeks recovery based upon the following alternative theories:

1. Bank IV through the foreclosure proceedings acquired the claim Christopher I would have against Arn, Mullins for either negligence or for breach of contract.
2. As a "successor" within the meaning of federal labor law, Bank IV acquired the claim Christopher I would have against Arn, Mullins.
3. Bank IV ultimately was required to pay the wage claims of Christopher I and is entitled to recover against Arn, Mullins under a theory of subrogation.

4. The relationship between Bank IV and Christopher I, known by Arn, Mullins, permits the Bank as a nonclient to recover for the attorneys' unprofessional acts of commission and omission.

## The Trial Court's Ruling

The trial court granted summary judgment to Arn, Mullins on all issues. The trial court noted that discovery had not been completed but concluded that the controverted facts were either not material or statements of arguable legal conclusions.

The trial court found as a matter of law:

1. Legal malpractice actions are personal to the client and cannot be transferred, assigned, or acquired at a foreclosure sale.
2. Bank IV did not acquire Christopher I's legal malpractice claim by succession under federal labor law because the claims of malpractice are personal to Christopher I and may not be transferred or assigned. In addition, successor liability was due to the subsequent deliberate decision of Bank IV to continue the business without a substantial change in form; therefore, there is no causal relationship between the alleged malpractice and the Bank IV loss (the successor liability).
3. Subrogation is not a proper basis upon which to predicate liability. Subrogation arises when one pays a debt for another for which the other is primarily liable. The theory of recovery based on subrogation is without merit because: (a) Bank IV has not paid a debt which is the primary obligation of Arn, Mullins; and (b) successor liability is a direct and primary obligation; thus, Bank IV paid its own debt to the NLRB, not the debt of Christopher I.
4. Under the facts of this case, Arn, Mullins owed no duty to Bank IV. The debtor/creditor relationship is akin to an adversarial relationship precluding recovery. However, the trial court applied the balancing test in *Pizel v. Zuspann*, 247 Kan. 54, 795 P.2d 42, *modified* 247 Kan. 699, 803 P.2d 205 (1990), and found liability was precluded.

## Summary Judgment

Summary judgment is proper where the pleadings and discovery show that: (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to judgment as matter

of law. When summary judgment is challenged on appeal, we must read the record in the light most favorable to the party who defended against the motion. *Patterson v. Brouhard,* 246 Kan. 700, 702, 792 P.2d 983 (1990).

Ordinarily, summary judgment should not be granted when discovery is incomplete. *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc.,* 245 Kan. 258, 274, 777 P.2d 1259 (1989), *cert. denied* 493 U.S. 1036 (1990). A disputed question of fact which is immaterial to the issue does not preclude summary judgment. *Knudson v. Kansas Gas & Electric Co.,* 248 Kan. 469, 483, 807 P.2d 71 (1991). Summary judgment is proper where the only question or questions presented are questions of law. *Barber v. Williams,* 244 Kan. 318, 319, 767 P.2d 1284 (1989).

### The Malpractice Claim—Assignment

Bank IV argues that Arn, Mullins' failure to give the 30-day notice was a ministerial act necessary to carry out its contract of representation with Christopher I; therefore, such failure is an assignable breach of contract claim. Bank IV reasons that its security interest included all general intangibles and contract rights which Bank IV now holds after foreclosure.

Arn, Mullins asserts that Bank IV did not acquire Christopher I's legal malpractice claim by foreclosure. The law firm reasons: (1) Legal malpractice claims are personal to the client; (2) public policy considerations dictate that legal malpractice claims should not be subject to assignment whether such claims sound in contract or in tort; (3) the alleged malpractice in this case is a tort claim, not a contract claim; and (4) tort claims are not assignable. See *Heinson v. Porter,* 244 Kan. 667, 675, 772 P.2d 778 (1989), *overruled on other grounds Glenn v. Fleming,* 247 Kan. 296, 799 P.2d 79 (1990).

The issue of whether an action for legal malpractice is assignable was addressed in the leading case of *Goodley v. Wank & Wank, Inc.,* 62 Cal. App. 3d 389, 133 Cal. Rptr. 83 (1976). In *Goodley,* the client had assigned her rights against her attorneys for negligence in handling her divorce. The California Court of Appeals concluded that a chose in action for legal malpractice is not assignable because of important policy considerations: "It is the unique quality of legal services, the personal nature of the at-

torney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment." 62 Cal. App. 3d at 397.

A majority of courts considering the assignability issue have agreed with the policy considerations underlying the *Goodley* decision and have held that legal malpractice claims are not assignable. See 1 Mallen & Smith, Legal Malpractice § 7.7, 369 (3d ed. 1989); and Annot., 40 A.L.R.4th 684.

The reasoning of *Goodley* is persuasive. Public policy considerations preclude the assignment of legal malpractice claims because such claims are personal to the client. The policy applies regardless of whether the claims sound in contract or tort. Therefore, we need not determine whether the legal malpractice claim in the case at bar sounds in contract or in tort.

Bank IV did not acquire Christopher I's legal malpractice claim against Arn, Mullins by assignment through foreclosure. Under the facts of the case at bar, the same policy reasons which prevent the assignment of legal malpractice claims also prevent acquiring such claims by assignment through a foreclosure action.

### Successor Liability

Bank IV argues that: (1) Successor liability under the NLRA allows Bank IV to step into the shoes of and succeed to the rights of Christopher I; and (2) imposing the burden of successor liability under the NLRA without also granting successor rights is unfair.

Arn, Mullins contends: (1) The same policy reasons which prevent assignment and foreclosure of malpractice claims also prevent transfer of such claims by succession; and (2) successor liability under the NLRA does not carry with it the right to assert legal malpractice claims held by the predecessor corporation. As applied to the facts in the case at bar, we agree.

The NLRB first recognized successor liability in *Perma Vinyl Corp.*, 164 N.L.R.B. 968 (May 24, 1967).

*Perma Vinyl* was approved by the United States Supreme Court in *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 38 L. Ed. 2d 388, 94 S. Ct. 414 (1973). In *Golden State*, the Supreme Court reasoned that if unfair labor practices were allowed to go unremedied, employees might identify the successor's labor policies with those of the predecessor, thereby frustrating the policies

of the NLRA. 414 U.S. at 184. The Supreme Court concluded that the goals of the NLRA could be achieved at a relatively minimal cost to the *bona fide* successor and stated the following rationale:

"Since the successor must have notice before liability can be imposed, 'his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.' *Perma Vinyl Corp.*, 164 N.L.R.B. at 969." 414 U.S. at 185.

Successor liability under the NLRA does not grant the successor employer the right to "step into the shoes" of the predecessor and succeed to the legal malpractice rights of the predecessor. Under the NLRA, the successor employer is expected to look out for its own interests when acquiring the predecessor or when deciding to carry on the business in a substantially unchanged form. The NLRA does not grant successor employers the right to assert legal malpractice claims held by the original employer.

The public policy rationale preventing the assignment of legal malpractice claims applies equally in the NLRA succession context. Due to the personal, confidential nature of the attorney/client relationship, legal malpractice claims should not be transferred by NLRA successor employer succession.

### Subrogation

Bank IV reasons that the equitable principles of subrogation allow it to step into the shoes of Christopher I and assert Christopher I's claim against Arn, Mullins. According to Bank IV, Arn, Mullins caused the loss (the unfair labor practice liability) and equity should force the law firm to bear the loss. Although Bank IV did not pay a debt owed by Arn, Mullins, Bank IV reasons it did pay a debt owed by Christopher I and, consequently, Bank IV is subrogated to the right of the debtor whose obligation it paid. Bank IV asserts it was forced to carry on the business in order to protect the value of the foreclosed assets. Arn, Mullins, representing the interests of Christopher I, took the position Bank IV had to continue the business to mitigate damages and to make a commercially reasonable disposition.

Arn, Mullins emphasizes that Bank IV may be subrogated only to the rights of the creditor to whom payment is made. Because

payment was made to the NLRB, Bank IV may recover from Arn, Mullins only if Arn, Mullins owed the NLRB, which it did not. Further, Arn, Mullins asserts that subrogation is only available when a person pays a debt for which another is primarily liable. Under the NLRA, successor liability is primary, based on the successor's knowledge of the unfair labor practice and the successor's decision to carry on the business in a substantially unchanged form. Thus, Bank IV is primarily liable and subrogation is not available. Finally, Arn, Mullins advances the argument that the same public policy considerations which prohibit assignment of legal malpractice claims also prohibit subrogation of such claims.

Bank IV counters that the public policy rationale is based on the privity rule which no longer prevails in Kansas and was never applied to subrogation. Further, the public policy rationale arises from the law of assignment of claims. Subrogation, according to Bank IV, is not dependent on the law of assignments. (Citing *United States Fidelity & Guaranty Co. v. First State Bank,* 208 Kan. 738, 494 P.2d 1149 [1972]; *Western Surety Co. v. Loy,* 3 Kan. App. 2d 310, 594 P.2d 257 [1979]).

Are the policy considerations that persuaded us to prohibit the assignment of legal malpractice claims applicable in the subrogation context? We believe, under the facts of the case at bar, they are.

In their discussion of the assignability of legal malpractice claims, Mallen and Smith state: "A related issue concerns subrogation by an insurer in an action against its insured's lawyer. When subrogating to a perceived right of its insured, the same basic policy considerations exist as involving a formal assignment." 1 Mallen & Smith, Legal Malpractice § 7.7, 370.

The relationship in the case at bar involves a creditor, a debtor, and a debtor's counsel. The tri-party relationship is one in which the interests of the creditor and debtor have the potential to diverge. To hold Arn, Mullins, whose loyalty runs to the debtor, liable to the creditor either directly, as we discuss later in the opinion, or indirectly by subrogation, could impair the attorney's ability to represent the debtor. See *Continental Cas. Co. v. Pullman, Comley, et al.,* 709 F. Supp. 44 (D. Conn. 1989), *aff'd* 929 F.2d 103 (2d Cir. 1991); and *Atlanta Int'l Ins. Co. v. Bell,*

438 Mich. 512, 475 N.W.2d 294 (1991) (Cavanagh, C.J., dissenting).

We hold that the policy considerations prohibiting the assignment of legal malpractice claims also prohibit the subrogation of a debtor's legal malpractice claim against the debtor's attorney by a creditor where the interests of the debtor and the creditor have the potential to diverge. Thus, we need not address the other subrogation arguments advanced by Bank IV and Arn, Mullins.

## A Duty Owing

The trial court ruled that the debtor/creditor relationship between Christopher I and Bank IV precludes any recovery by Bank IV upon the direct claim of legal malpractice. *Nelson v. Miller,* 227 Kan. 271, Syl. ¶ 4, 607 P.2d 438 (1980) ("An attorney cannot be held liable for the consequences of his professional negligence to his client's adversary."). However, the trial court determined the balancing test in *Pizel v. Zuspann,* 247 Kan. 54, should also be considered. After applying the *Pizel* balancing test, the trial court concluded that Arn, Mullins is not liable to Bank IV.

Bank IV asserts that the trial court: (1) failed to make findings of fact as required by our Rule 165 (1991 Kan. Ct. R. Annot. 126); (2) was in error in concluding that no uncontroverted material facts existed; and (3) was in error in relying on *Nelson* because there was no evidence of an adversarial relationship.

Neither Bank IV's Rule 165 argument nor its material fact contention is persuasive. The trial court's order granting summary judgment consists of nine pages containing findings of fact and the trial court's legal reasoning. We agree with the trial court's material fact analysis.

The adversaries in the labor action, according to Bank IV, were the NLRB and the union on one side with Christopher I and Bank IV on the other. In addition, Bank IV contends the rule imposing no duty owing to an adversary applies only to adversaries in litigation, not to adversaries in business and contract cases. Finally, Bank IV reasons that the application of *Pizel* supports its right to bring this action.

Arn, Mullins counters, arguing: (1) No question of material fact exists; (2) *Pizel* should not be applied due to the adversarial nature of the creditor/debtor relationship; (3) the rule imposing no duty

to an adversary applies equally in the litigation and nonlitigation setting; (4) the first *Pizel* factor, "intent to benefit" the plaintiff, is the predominant inquiry and is nonexistent in the Bank IV/ Christopher I/Arn, Mullins relationship; (5) the instant fact scenario is distinguishable from *Pizel*; and (6) if the *Pizel* test is applied, liability is precluded as a matter of law. (Arn, Mullins appears to argue that intent to benefit Bank IV is a threshold factor.)

We held in *Nelson* that an attorney cannot be held liable for the consequences of professional negligence to an adversary of the client. Traditionally, an attorney can be held liable for negligence only to a client. The attorney/client rule is based upon the rationale that privity of contract must exist between the plaintiff and the attorney. 227 Kan. at 286-87 (citing *Young v. Hecht*, 3 Kan. App. 2d 510, 514, 597 P.2d 682, *rev. denied* 226 Kan. 793 [1979]). *Nelson* noted that the strict privity rule had been eased in situations where an attorney renders services that the attorney should recognize as involving foreseeable injury to a third-party beneficiary of the attorney-client contract. 227 Kan. at 287.

In *Pizel*, we adopted the California multi-criteria balancing test and recognized that a trust beneficiary may have a claim for negligence against the attorney drafting the trust despite the fact the beneficiary was not in privity with the attorney. Whether an attorney may be liable to parties not in privity depends upon a balancing of a number of factors, including: (1) the extent to which the transaction was intended to affect plaintiffs; (2) the foreseeability of harm to plaintiffs; (3) the degree of certainty that plaintiffs suffered injury; (4) the closeness of the connection between the attorney's conduct and the injury; (5) the policy of preventing future harm; and (6) the burden on the profession of the recognition of liability under the circumstances. 247 Kan. 54, Syl. ¶ 5.

Bank IV argues that Unruh, as corporate secretary, certified the representations made by Christopher I in the credit agreement.

This certification merely reflects that the Board of Directors of Christopher I met and adopted resolutions to execute the credit agreement. The certification states that the following corporate

resolutions were adopted and sets out the adopted resolutions. Furthermore, Bank IV was fully aware of the pending labor dispute in October 1986 when it entered into the credit agreement. The affidavit of Bank IV's executive vice-president states:

"3. During 1986, as a result of Christopher's severe financial losses, the Bank had to consider whether it should continue to extend credit to the company. *Christopher represented to the Bank* that it was addressing its problems and reducing operating expenses. *Christopher represented to the Bank* that it had terminated its Union contract, reduced wages, and laid off unnecessary workers. *I was told at some point that Christopher had a dispute with its union,* although I was not aware of the allegations or issues being raised. *It was represented to me by George Christopher* that the union dispute did not amount to anything and that the union's claims were groundless. I understood and believed that these statements represented the view of directors of the company, including the company's attorney, Milo Unruh, and were based upon and consistent with the advice of Arn, Mullins, the Company's law firm. *In reliance on these representations,* the Bank continued to extend credit." (Emphasis added.)

The credit agreement required an opinion letter of the borrower's counsel. The letter was furnished by Arn, Mullins. Although the credit agreement required the opinion letter to address specific numbered sections of the agreement, *i.e.,* 5.13, 5.14, 5.15, as well as other matters, two numbered sections, 5.05 (litigation) and 5.09 (compliance), were excluded from the letter's requirements. Bank IV was free to consult its own counsel as to the effect of the labor dispute-NLRB claim, as the Mullen group did.

We note that Supreme Court Rule 226, MRPC 2.3 (1991 Kan. Ct. R. Annot. 272) states:

"(a) A lawyer may undertake an evaluation of a matter affecting a client for the use of someone other than the client if:
    (1) the lawyer reasonably believes that making the evaluation is compatible with other aspects of the lawyer's relationship with the client; and
    (2) the client consents after consultation.

"(b) Except as disclosure is required in connection with a report of an evaluation, information relating to the evaluation is otherwise protected by Rule 1.6."

The comment to MRPC 2.3 states:

"Duty to Third Person

"When the evaluation is intended for the information or use of a third person, a legal duty to that person may or may not arise. That legal question is beyond the scope of this Rule. However, since such an evaluation involves a departure from the normal client-lawyer relationship, careful analysis of the situation is required. The lawyer must be satisfied as a matter of professional judgment that making the evaluation is compatible with other functions undertaken in behalf of the client." (1991 Kan. Ct. R. Annot. 273.)

Under the uncontroverted facts, there is no indication that: (1) Bank IV requested an opinion letter from Arn, Mullins or from Christopher I as to the NLRB-unfair labor practice matter; (2) Arn, Mullins' advice, opinions, or information concerning the NLRA § 8(d)(3) 30-day notice and the unfair labor practice claim, as attorneys for Christopher I, was intended for the information or use of Bank IV as a nonclient third party; and (3) Arn, Mullins knew or should have known that Bank IV was relying on Arn, Mullins' opinion, information, or advice as to the 30-day notice and unfair labor practice claim.

The relationship of Bank IV and Christopher I was that of creditor and debtor. The relationship between borrower and lender is usually recognized as being sufficiently adversarial, at least potentially so, that a lawyer for one party is found to owe no duty to the other party upon which a malpractice claim could be based. ABA/BNA Lawyers' Manual on Professional Conduct, Liability to Nonclients; Loans, 301:612 (1990). However, we need not decide the case at bar on the rationale of *Nelson's* adversarial relationship concept. We note MRPC 2.3 contemplates an evaluation by an attorney for someone other than the client. Borrower-lender relationships need not always be adversarial. What are the guidelines to determine when an attorney should carry the obligation to protect a nonclient's interest in a borrower-lender relationship?

Recently we addressed protecting a nonclient's interest in an estate planning context, *Pizel v. Zuspann.* However, the geometry of the facts in the case at bar presents a different triangle, that of borrower-client (Christopher I), lender-nonclient (Bank IV), and defendant attorneys (Arn, Mullins). Thus, we do not rely on *Pizel* in resolving the case at bar.

What representations concerning the NLRB unfair labor practice claim did Arn, Mullins make directly to Bank IV upon which

Bank IV relied? Did Arn, Mullins intend or expect such reliance? The direct representation-intended reliance inquiry is key.

Before a nonclient third-party lender may state a legal malpractice claim against a borrower's attorney, a showing must be made that the attorney directly advised the lender or that the attorney intended or expected the lender to rely on the attorney for legal services concerning the matter in issue.

Arn, Mullins did not directly advise Bank IV concerning the union dispute. The record does not reflect that Arn, Mullins intended or expected Bank IV to rely upon the firm for legal services relating to the 30-day notice or the dispute with the union. The affidavit of Bank IV's executive vice-president establishes that Bank IV believed George Christopher's representations were the view of Unruh and consistent with Arn, Mullins' advice. However, Bank IV has not made a showing that Arn, Mullins either directly advised Bank IV or intended or expected Bank IV to rely on the firm's legal services.

We hold that under the facts of the case at bar, Arn, Mullins owed no duty to Bank IV. Summary judgment was proper.

Affirmed.

HOLMES, C.J., not participating.

■ TERRY L. BULLOCK, District Judge, assigned, participating.