SWISS REINSURANCE AMERICA CORPORATION, INC. et al., Appellants,

v.

ROETZEL & ANDRESS et al., Appellees.

[Cite as *Swiss Reinsurance Am. Corp., Inc. v. Roetzel
& Andress,* 163 Ohio App.3d 336, 2005-Ohio-4799.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22523.

Decided Sept. 14, 2005.

338

Gary W. Hammond, for appellants.

John Hill, for appellees.

———————

MOORE, Judge.

{¶ 1} Appellants, Swiss Reinsurance America Corp., Inc. ("Swiss Re") and Frontier Insurance Co. ("Frontier"), appeal from the judgment of the Summit County Court of Common Pleas granting summary judgment in favor of appellees. This court affirms.

I

{¶ 2} Frontier retained appellee Tom Treadon to defend its insured, Dr. Thomas Robinson, in a medical malpractice action. Dr. Robinson was accused of failing to timely respond to a telephone call from a hospital emergency room reporting that one of his patients, a seven-and-one-half-month-pregnant woman, had been involved in an automobile accident. At the outset of his involvement, Treadon informed Frontier that he felt that the case was defensible, but that settlement in the range of $500,000 to $1,000,000 should be considered.

{¶ 3} As the litigation progressed, Treadon grew more confident in the case, noting that the plaintiffs' experts were not solid and that the defense experts made very good witnesses. In fact, the plaintiffs contacted Treadon to inform him that they intended to dismiss the action. Treadon agreed that he would not contest the dismissal without prejudice if the plaintiffs agreed that they would not replace their expert witnesses. When the case was refiled, the trial court determined that the plaintiffs could alter their experts witnesses, and the plaintiffs proceeded to retain new experts.

{¶ 4} As trial approached, Treadon repeatedly confronted Frontier, urging that the matter be settled. He informed Frontier that the plaintiffs' new expert witnesses were much stronger than the initial experts and that Dr. Robinson had a much greater exposure based on these new events. Throughout the course of the litigation (including the previously dismissed action), beginning in April 1997, Dr. Robinson demanded that the matter be settled. Dr. Robinson believed that if the matter proceeded to trial and the jury returned a plaintiffs' verdict, he could suffer personal exposure because of the amount of the potential damage award. In fact, on April 8, 1997, his privately retained counsel wrote a letter to Frontier demanding that the matter be settled within the policy limits and threatening to bring a bad-faith claim if the matter was not successfully resolved.

{¶ 5} Despite Treadon's advice and Dr. Robinson's requests, Frontier continued to urge that the matter be tried. This disagreement with Treadon was one

of many that persisted throughout the litigation. Frontier continually questioned Treadon's billing statements and reporting habits. Frontier asserted that Treadon routinely failed to timely report on events in the litigation. In contrast, Treadon asserted that Frontier's requests were numerous and duplicative of prior information that he had provided. As a result of the friction between Treadon and Frontier and in response to the "bad faith" letter written by Dr. Robinson's private counsel, Frontier hired coverage counsel to evaluate the case. In addition, Frontier replaced Treadon as lead counsel shortly before the trial began.

{¶ 6} Treadon's replacement, Gary Goldwasser, concurred with Treadon's recommendation that the case should be settled for up to $2,000,000 before trial, but indicated that he felt that he could put forth a viable defense if necessary. Frontier, again, chose to go forward with trial against the recommendations of every party involved. After two days of trial, Frontier agreed to settle the matter and paid $2,200,000.

{¶ 7} Subsequent to the settlement, Frontier sought recovery from the reinsurance company, Swiss Re, in the amount of $1,000,000. Swiss Re asserted that Frontier had a contractual duty to mitigate its damages by suing Treadon for malpractice. Frontier responded that it would cooperate in a suit against Treadon, but that it did not wish to file suit. Swiss Re responded that no payment would be made unless Frontier filed suit. Frontier relented, filed suit, and was then paid by Swiss Re.

{¶ 8} Suit was filed against Treadon on January 18, 2000. After the parties had moved for summary judgment, the proceedings in the trial court were stayed. The stay resulted from proceedings in New York state regarding the Superintendent of Insurance's taking possession of and rehabilitating Frontier. A little more than three years later, the stay was lifted, and the matter proceeded.

{¶ 9} Shortly after the proceedings resumed, the trial court granted appellees' motion for summary judgment, finding that appellants lacked standing to file their legal-malpractice claim. Appellants timely appealed from the judgment, raising two assignments of error for review.

II

### ASSIGNMENT OF ERROR I

The trial court erred in granting summary judgment to [appellees] because [appellants] have standing to sue appellees for negligent representation[.]

{¶ 10} In their first assignment of error, appellants assert that the trial court erred in finding that they lacked standing to pursue their legal-malpractice claim. This court disagrees.

{¶ 11} This court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. We apply the same standard as the trial court, viewing the facts of the case in the light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378, certiorari denied (1986), 479 U.S. 948, 107 S.Ct. 433, 93 L.Ed.2d 383.

{¶ 12} Pursuant to Civ.R. 56(C), as interpreted by the Ohio Supreme Court, summary judgment is proper if:

(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

{¶ 13} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264. Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). Id. Once this burden is satisfied, the nonmoving party bears the burden of offering specific facts to show a genuine issue for trial. Id. at 293, 662 N.E.2d 264. The nonmoving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact. *Henkle v. Henkle* (1991), 75 Ohio App.3d 732, 735, 600 N.E.2d 791.

{¶ 14} In both appellees' motion for summary judgment and appellants' opposition to the motion, the parties rely upon the numerous depositions taken during the course of discovery. Primarily, these depositions were given by Treadon, Dr. Robinson, and numerous employees from Frontier who were involved in handling the medical-malpractice claim. Based upon these depositions, the parties took differing stances as to whether standing existed for Frontier and Swiss Re to pursue their claims. Ultimately, the trial court found that Frontier and Swiss Re lacked standing and entered judgment in favor of appellees.

## Standing as a Client

{¶ 15} Frontier first asserts that it has standing to pursue a legal-malpractice claim against Treadon because it was Treadon's client during the underlying medical-malpractice claim. We disagree.

{¶ 16} Generally, "an attorney may not be held liable by third parties as a result of having performed services on behalf of a client, in good faith, unless the third party is in privity with the client for whom the legal services were performed, or unless the attorney acts with malice." *Simon v. Zipperstein* (1987), 32 Ohio St.3d 74, 76, 512 N.E.2d 636. Frontier urges that such a rule does not bar its claim because it is not a third party. In support, Frontier relies upon *Netzley v. Nationwide Mut. Ins. Co.* (1971), 34 Ohio App.2d 65, 63 O.O.2d 127, 296 N.E.2d 550.

{¶ 17} In *Netzley,* the Second District held:

[B]oth Nationwide as well as Mr. Netzley, its insured, were clients of the legal counsel retained by Nationwide. Further, we hold that both clients had a mutuality of interest in all of the affairs related to such cause of action, and both were equally entitled to any and all information, analysis, aid, or advice relating to such matter.

Id. at 79, 63 O.O.2d 127, 296 N.E.2d 550. However, the *Netzley* court was responding to the assertion that the *insured* was not a client. In *Netzley,* the *insurer* had taken the position that only it was the client. In addition, *Netzley* makes no mention of a conflict between the insurer and insured. Accordingly, we are not persuaded that *Netzley* is applicable to the case at hand.

{¶ 18} Frontier further urges that this court apply the general rules regarding the creation of an attorney-client relationship to the situation at hand. Frontier urges that its contract with Treadon creates such a relationship. In the alternative, Frontier asserts that Treadon's conduct of providing legal advice to Frontier establishes the relationship. See *McGuire v. Draper, Hollenbaugh & Briscoe Co., L.P.A.,* 4th Dist. No. 01CA21, 2002-Ohio-6170, 2002 WL 31521750, at ¶ 41. We are persuaded, however, that such an approach is not appropriate.

Despite the unique characteristics of the tripartite relationship between defense counsel, insurers, and insureds, Farmland and Pine Island argue that we should simply apply the general rules regarding the creation of attorney-client relationships to the facts of this case to determine whether Erstad & Riemer represented Farmland. Although we agree that an insurer seeking to establish the existence of an attorney-client relationship with defense counsel can do so using contract or tort theory, merely applying the general rules would not adequately address our concerns regarding dual representation in insurance defense cases. In light of the insurer's rights to control the defense of claims, exchanges of information between defense counsel and the insurer— including exchanges in which the insurer seeks, receives, and relies on legal advice from defense counsel—are bound to occur. Thus, a holding that these exchanges, standing alone, are sufficient to create an attorney-client relationship between defense counsel and the insurer would result in a rule that

defense counsel represents the insurer in virtually every insurance defense case. Furthermore, such a holding would allow defense counsel to represent the insurer without the insured's consent or knowledge of the significant risks posed by dual representation. (Citations omitted.)

*Pine Island Farmers Coop v. Erstad & Riemer, P.A.* (Minn.2002), 649 N.W.2d 444, 451. The inherent danger in tripartite relationships is that defense counsel " 'may be tempted to help the client [the insurer] who pays the bills, who will send further business, and with whom long-standing personal relationships have developed.' " Id. at 450, quoting Mallen & Smith, 4 Legal Malpractice (5th Ed.2000) 325, Section 29.16. We agree with the rationale set forth by *Pine Island* and proceed to consider whether, under the circumstances presented, a finding that Frontier was Treadon's client is appropriate.

{¶ 19} The parties do not dispute that Treadon's primary allegiance was to Dr. Robinson. As such, our long-standing rules of agency negate any claim by Frontier that it was also Treadon's client.

{¶ 20} An agent cannot "serve two masters whose interests were incompatible, but he could properly serve both parties so long as the duties were consistent." *Johnson v. N. British & Mercantile Ins. Co.* (1902), 66 Ohio St. 6, 14, 63 N.E. 610. "Certainly an attorney may not ordinarily represent principals with conflicting interests[.]" *Mahoning Cty. Bar Assn. v. Ruffalo* (1964), 176 Ohio St. 263, 272, 27 O.O.2d 161, 199 N.E.2d 396 (Gibson, J., concurring). Frontier seeks to avoid these maxims by asserting that no actual conflict existed between its interests and Dr. Robinson's interests and that only a potential for conflict existed. A review of the record does not support such a claim.

{¶ 21} The following testimony was elicited by Frontier's counsel from Dr. Robinson:

Q. There is an April 97 letter and it says basically what the October 98 letter says from Krugliak which says, Settle the damn case. * * * Why were you having your counsel, Krugliak, make a demand on Frontier to settle the case? * * * Is the answer because you were trying to protect your personal assets and write a demand letter to the notice on Frontier if the case went badly, even though you didn't expect it to go badly?

A. I believe that's the motivation for it.

* * *

Q. The next document is the October 30, 98 letter from Krugliak, again, to protect your personal assets, * * * correct?

A. Right.

* * *

A. And Mr. Treadon told me that he recommended settling. And he told me of the weakness in Scher's and Rayburn's cases and since they had been able

to switch—plaintiff's (sic) had been able to switch witnesses, that they were in a more favorable position. * * * Mr. Widem's enthusiasm for going to trial kind of surprised me because he had been—I understood that he had been informed by Mr. Treadon or knew of Mr. Treadon's letters of what his position was and why.

Now, when my—when the attorney who's supposed to be representing me feels fairly strongly that we should settle and Mr. Widem representing the insurance company feels we should go to trial, that seemed very peculiar to me.

As Dr. Robinson's testimony indicates, he retained his own counsel and twice sent letters demanding that the medical-malpractice claim be settled. On repeated occasions, Treadon advised Dr. Robinson that the case could be settled within the policy limits and informed Dr. Robinson that Frontier was aware of the current settlement status.

{¶ 22} Jonathan Widem, a claims examiner for Frontier who handled the medical-malpractice claim, was asked in his deposition whether a conflict existed between Frontier and Dr. Robinson and responded: "I guess only to the degree that Dr. Robinson, through his personal attorney, had expressed a desire to have the case settled." In addition, the following colloquy took place.

Q. But here's what I want to get to, that's a conflict, though, isn't it? The insured wants to settle, insurance company doesn't want to settle; that's a conflict isn't it, sir?

A. Yes. I would assume that's a—characterize it as a conflict.

{¶ 23} The inherent dangers of a conflict arising in a tripartite relationship were again evidenced prior to trial. By this time, Frontier had hired both coverage counsel to assess the performance of Treadon and trial counsel, Goldwasser, to replace Treadon. Shortly before trial, both Treadon and Goldwasser recommended that the case be settled. Again, Frontier disregarded this advice and the wishes of Dr. Robinson. It was only after Dr. Robinson was subject to cross-examination during the plaintiffs' case that Frontier chose to settle.

{¶ 24} The events that occurred just prior to trial serve as examples of the continuing conflict between Dr. Robinson and Frontier. In representing Dr. Robinson, Treadon repeatedly advised that settlement should be considered. As the plaintiffs' case grew stronger with improved experts, Treadon urged that settlement was still a viable option. However, rather than accede to Dr. Robinson's wishes, Frontier's employees repeatedly asserted that their judgment was equal to or superior to Treadon's and declined to offer a legitimate settlement.[1] With respect to trial strategy, Widem opined that Treadon's advice to his

---

1. While Frontier elevated settlement authority to $800,000, Widem offered only $400,000 to settle the matter.

company on settlement could be rejected because he was merely one part of a team defense.

Q. [Y]ou did not see Treadon as having more expertise than you did in strategy about how to try a case, am I correct about that?

A. Correct.

The above questioning succinctly states Frontier's position throughout the litigation: Frontier felt that it could override the wishes of Dr. Robinson and the advice of Mr. Treadon when they did not agree with the advice.

{¶ 25} Accordingly, we find that a clear conflict existed between the interests of Dr. Robinson and Frontier. This conflict was evidenced for the first time in April 1997 when Dr. Robinson's counsel sent his first letter demanding that the matter be settled. While Frontier asserts that such a letter is common in the industry, such a claim does not change the reality that the letter demanded settlement. We note that Frontier is "hardly a neophyte in these matters." *Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves* (C.A.2, 1991), 929 F.2d 103, 106. The record reflects that Frontier was aware of the conflict that arose when Treadon refused to place Frontier's interest in proceeding to trial in front of Dr. Robinson's interest in settlement. Frontier evaluated its options and hired its own counsel because of the persistent conflict presented by Dr. Robinson's desire to settle. Accordingly, we find that the active conflict between the insured and the insurer prevents a finding that Frontier was Treadon's client.

**Standing Through Privity with Client**

{¶ 26} Frontier urges that it has standing to sue because it was in privity with Dr. Robinson. We find that such an argument lacks merit.

{¶ 27} As noted above, standing exists to pursue a legal-malpractice claim if the plaintiff was in "privity with the client for whom the legal services were performed." *Simon*, 32 Ohio St.3d at 76, 512 N.E.2d 636. This court, however, disagrees with Frontier's assertion that contractual privity is the equivalent of the privity required to bring a malpractice claim. In determining privity in the context of standing to bring a malpractice claim, we must determine whether the parties' interests are the same, such that representing the client is equivalent to representing the party alleging privity with the client. See *Scholler v. Scholler* (1984), 10 Ohio St.3d 98, 104, 10 OBR 426, 462 N.E.2d 158. "For legal malpractice purposes, privity between a third person and the client exists where the client and the third person share a mutual or successive right of property or other interest." *Sayyah v. Cutrell* (2001), 143 Ohio App.3d 102, 111–112, 757 N.E.2d 779.

{¶ 28} Frontier urges that both it and Dr. Robinson had a mutual interest in a proper defense from Treadon. While these interests may have been in harmony

at the inception of the case, as noted supra, the parties' interests diverged quickly. Subsequent to Dr. Robinson's April 1997 demand letter, the parties' interests were never mutually aligned. Dr. Robinson urged settlement on the advice of Treadon, and Frontier repeatedly refused to engage in settlement negotiations. The record reflects that Dr. Robinson's interest was in having the matter settled within the policy limits to avoid personal exposure. In contrast, Frontier's interest, as made clear by its handling of the case, was to minimize payout at the expense of Dr. Robinson's interests. Accordingly, we cannot conclude that Frontier was in privity with Dr. Robinson in a manner that would permit Frontier to bring a legal-malpractice claim.

**Equitable Subrogation**

{¶ 29} Frontier and Swiss Re both assert that even if Frontier is found not to have been Treadon's client, equitable subrogation provides them the right to file suit. Under the circumstances presented here, we disagree.

Equitable subrogation is a doctrine

"under which, as a result of the payment of a debt by a person other than the principal debtor, there is a substitution of the former in the place of the creditor to whose rights he succeeds in relation to the obligation of the debtor, to the end that the burden of obligation be ultimately placed upon those to whom it primarily belongs, although in the recognition of the rights of others it may have been, for a time, borne by those who are only secondarily liable for the debt."

*Maryland Cas. Co. v. Gough* (1946), 146 Ohio St. 305, 315, 32 O.O. 365, 65 N.E.2d 858. Contrary to appellants' assertions, however, this doctrine is not overwhelmingly recognized in the context of permitting a third party to file suit for legal malpractice.

{¶ 30} Our review indicates that states have taken divergent views on the ability of an insurance company to step in to the shoes of its insured and file suit for legal malpractice. While many of these cases deal with the ability of an excess insurer to file suit against the insured's defense counsel, we find the rationale behind them to be equally applicable to both Frontier and Swiss Re.

Many jurisdictions which have addressed the precise issue before the court have allowed an excess insurer to assert a legal malpractice claim against the insured's defense attorney under the doctrine of equitable subrogation. See *Allstate Ins. Co. v. Am. Transit Ins. Co.* (E.D.N.Y.1997), 977 F.Supp. 197, 201 (applying New York law); *Am. Centennial Ins. Co. v. Canal Ins. Co.* (Tex. 1992), 843 S.W.2d 480, 484; *Atlanta Intl. Ins. Co. v. Bell* (1991), 438 Mich. 512, 521, 475 N.W.2d 294; see cf. *Gen. Accident Ins. Co. v. Schoendorf & Sorgi* (1996), 202 Wis.2d 98, 549 N.W.2d 429; *Chem. Bank of New Jersey Natl. Assoc. v. Bailey* (1997), 296 N.J.Super. 515, 687 A.2d 316; *Great Am. Ins. Co. v. Perry*

(Minn.App.1994), 1994 WL 101991, at *2. However, a few jurisdictions have refused to recognize an excess insurer's right to maintain such an action. See *St. Paul Ins. Co. of Bellaire, Texas v. AFIA Worldwide Ins. Co.* (C.A.5, 1991), 937 F.2d 274, 279 (applying Louisiana law); *Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves* (C.A.2, 1991), 929 F.2d 103, 107 (applying Connecticut law); see cf. *Bank IV Wichita, Natl. Assoc. v. Arn, Mullins, Unruh, Kuhn & Wilson* (1992), 250 Kan. 490, 827 P.2d 758; *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg* (1994), 30 Cal.App.4th 1373, 36 Cal.Rptr.2d 424. *Natl. Union Ins. Co. v. Dowd & Dowd, P.C.* (N.D.Ill.1998), 2 F.Supp.2d 1013, 1024–25.

This court is persuaded that Ohio's zealous guarding of the attorney-client relationship compels a holding that equitable subrogation is not available to appellants.

{¶ 31} Appellants urge that the "only winner produced by an analysis precluding liability would be the malpracticing attorney." *Atlanta Intl.*, 438 Mich. at 522, 475 N.W.2d 294. Appellants, however, fail to recognize a key fault in their analysis: they ignore the conflict that existed with Dr. Robinson. Appellants' claim of malpractice alleges that Treadon failed to properly prepare a defense for Dr. Robinson. During his deposition, Dr. Robinson indicated as follows:

Q. Were you satisfied with Mr. Treadon's preparation?

A. Yes.

{¶ 32} Accordingly, from the *insured's* perspective, Treadon had complied with the *insured's* stated interests. In contrast, appellants would like to place Treadon in the untenable position of somehow fulfilling the conflicting interests of both parties. We find that equity compels a holding that when the interests of an insured conflict with the interests of the insurer, equitable subrogation will not exist to permit a claim of legal malpractice when the record reflects that the attorney has complied with the interests of his client to the detriment of the insurer.

{¶ 33} To permit equitable subrogation in this context "would drive a wedge between counsel and the insured to the inexorable detriment of the attorney-client relationship[.]" *Pullman*, 929 F.2d at 107. Indeed, the attorney would be placed in an even more precarious position than is inherent in a tripartite relationship. In the case presented, a conflict clearly existed between the insurer and the insured. Treadon, an attorney paid by the insurance company but with primary allegiance to the insured, could not escape liability if this court chose to follow the doctrine of equitable subrogation. If Treadon maintained his allegiance to Dr. Robinson, Frontier would file suit; if Treadon fell victim to the pressure exerted by Frontier, Dr. Robinson would file suit. To permit such a result would "substantially impair an attorney's ability to make decisions that

require a choice between the best interests of the insurer and the best interests of the insured." *Atlanta Intl.*, 438 Mich. at 535, 475 N.W.2d 294 (Cavanaugh, C.J., dissenting).

## Due Process

{¶ 34} Appellants urge that they have a right of subrogation and that any determination that they cannot pursue their claims is an unlawful deprivation of that right. Appellants cite no authority for the proposition that their right of equitable subrogation is a fundamental property right. Further, appellants have offered no argument that the trial court's determination that their right of subrogation did not extend to legal-malpractice claims constituted a taking.[2] Accordingly, "[i]f an argument exists that can support [appellants assertion], it is not this courts duty to root it out." *Cardone v. Cardone* (May 6, 1998), 9th Dist. Nos. 18349 and 18673, 1998 WL 224934, at *22.

## Equal Protection

{¶ 35} Appellants urge that denying them the right to pursue a legal malpractice claim under the circumstances presented is a violation of equal protection. We disagree.

{¶ 36} As appellants have not identified or urged that a fundamental right or a suspect class is involved, we proceed to a rational-basis review. *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 58, 514 N.E.2d 709. Under a rational-basis review, the rule must be upheld "if there exists any conceivable set of facts under which the classification rationally furthered a legitimate legislative objective." *Denicola v. Providence Hosp.* (1979), 57 Ohio St.2d 115, 119, 11 O.O.3d 290, 387 N.E.2d 231.

{¶ 37} As indicated throughout this opinion and Ohio case law, the attorney-client privilege has been protected from the intrusion of third parties.

"Some immunity from being sued by third persons must be afforded an attorney so that he may properly represent his client. To allow indiscriminate third-party actions against attorneys of necessity would create a conflict of interest at all times, so that the attorney might well be reluctant to offer proper representation to his client in fear of some third-party action against the attorney himself."

*Simon*, 32 Ohio St.3d at 76, 512 N.E.2d 636, quoting *W.D.G., Inc. v. Mut. Mfg. & Supply Co.* (Nov. 4, 1976), 10th Dist. No. 76AP–366, 5 O.O.3d 397, 1976 WL 190343. The rule that an insurance company may not sue for legal malpractice

---

2. To the contrary, the trial court ruled and this court agrees that appellants' subrogation rights do not extend to legal-malpractice claims. Having determined that appellants do not have such a right, it is difficult to conceive of any taking that has occurred.

when a defense attorney fulfills his duty to the insured to the detriment of the insurer rationally furthers this legitimate interest in protecting the attorney-client relationship. Accordingly, appellants' equal-protection challenge lacks merit.

{¶ 38} Frontier and Swiss Re lack standing to pursue a legal-malpractice claim against appellees. Accordingly, appellants' first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

The trial court erred in denying appellants' motion for summary judgment that Mr. Treadon was negligent which negligence proximately caused appellants damage, and for which Roetzel & Andress is vicariously liable[.]

{¶ 39} In their second assignment of error, appellants argue that the trial court erred in denying their motion for summary judgment. Based upon our conclusion that appellants lacked standing to pursue their claims, the trial court properly denied the motion. Appellants' second assignment of error is overruled.

### III

{¶ 40} Appellants' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

WHITMORE, P.J., and BATCHELDER, J., concur.