Wilhelm GOEBEL and Ulrich Stocke, General Partners of W. Goebel Porzellanfabrik KG, a German Limited Partnership, individually and on behalf of the partnership, and Goebel Art GmbH, Plaintiffs,

v.

SCHMID BROTHERS, INC., Schmid, a Massachusetts Business Trust, Schmid, Inc., Paul A. Schmid, III, Morris Zukerman, and M.E. Zukerman & Co., Defendants.

SCHMID, INC., Plaintiff–
in–Counterclaim,

v.

Wilhelm GOEBEL and Ulrich Stocke, as individuals and representatives of W. Goebel Porzellanfabrik, a German Limited Partnership, Goebel Art GmbH, Goebel Marketing Company, and Broad Street Financial Company, Defendants–in–Counterclaim.

Civ. A. No. 93–12737–REK.

United States District Court,
D. Massachusetts.

Oct. 14, 1994.

James S. Dittmar, Richard Lavin, Andrew Troop, Hutchins & Wheeler, Boston, MA, Charles J. Kurtz, III, Jack R. Pigman, Jean Y. Teteris, and Jennifer T. Mills, Porter, Wright, Morris & Arthur, Columbus, OH, for W. Goebel Porzellanfabrik KG, Goebel Marketing Co., and Broad Street Financial Co.

Stephen D. Poss, Michael J. Pappone, and Donald B. Gould, Goodwin, Proctor & Hoar, Boston, MA, for Schmid Bros. Inc.

Andrew Z. Schwartz and Donald R. Ware, Foley, Hoag & Eliot, Boston, MA, for Paul A. Schmid, III.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, MA and Jay B. Kasner, Skadden, Arps, Slate, Meagher & Flom, New York City, for Morris Zuckerman.

Patrick P. Dinardo and Lena G. Goldberg, Sullivan & Worcester, Boston, MA, for Official Unsecured Creditors Committee.

## MEMORANDUM AND ORDER

KEETON, District Judge.

Now pending before this court is defendant Paul A. Schmid, III's Motion to Dismiss Amended Complaint (Docket No. 47, filed March 4, 1994), with supporting memoranda (Docket No. 48, filed March 4, 1994, Docket No. 74, filed March 30, 1994). Plaintiffs filed a memorandum in opposition to the motion to dismiss (Docket No. 67, filed March 21, 1994).

On June 24, 1994, this court granted defendant Schmid's motion to dismiss all alter ego claims against him. Pursuant to the parties' request, the court allowed submission of supplemental memoranda and responses thereto on the motion to dismiss the remaining (ninth) claim for relief against Mr. Schmid for fraudulent misrepresentation. (Docket No. 116, filed July 13, 1994; Docket No. 120, filed July 20, 1994; Docket No. 119, filed July 13, 1994; Docket No. 117, filed July 20, 1994).

This Memorandum addresses the claim against Mr. Schmid for fraudulent misrepresentation.

## I. Background

The claim against Paul A. Schmid, III ("Mr. Schmid") for fraudulent misrepresentation is part of a larger complaint (consisting of eleven counts) against Mr. Schmid, Morris E. Zukerman and M.E. Zukerman & Co., and three business entities that are sometimes referred to in this Memorandum as "Schmid". The three entities are Schmid Brothers, Inc. (an entity no longer in existence), Schmid, a Massachusetts Business Trust, and Schmid, Inc. All three are Massachusetts entities with principal places of business in Randolph, Massachusetts.

Plaintiffs are W. Goebel Porzellanfabrik KG, a German Limited Partnership, and Goebel Art GmbH, a German corporation wholly owned by Goebel. Third Amended Complaint ¶ 2. Unless otherwise noted, the term "Goebel" in this Memorandum will refer to both Goebel (the partnership) and Goebel Art (the corporation).

Most of Goebel's claims are directed against Schmid. These claims include breach of contract, bad faith, open account and goods sold and delivered, trademark infringement, unfair competition, tortious interference with business relations, and fraud. The individual defendants (Mr. Schmid and Mr. Zukerman) are implicated only in the alleged fraud.

This civil action is a result of the breakdown of a long-time business relationship between Goebel and Schmid.

Goebel manufactures figurines in Bavaria, Germany, its principal place of business. Complaint ¶¶ 2, 8. Since 1937, Schmid has purchased these figurines from Goebel for distribution in the United States. Third Amended Complaint ¶ 10. Goebel and Schmid entered into an Exclusive Distribution Agreement ("EDA") in 1988. Id. at ¶ 11. Goebel alleges that various failures by Schmid, Inc., to perform its obligations under the EDA led to Payments Agreements in August 1992 (Third Amended Complaint ¶ 22) and February 1993 (Third Amended Complaint ¶ 34). Goebel bases its claim against Mr. Schmid for fraudulent misrepresentation on his conduct relating to the February 1993 Payments Agreement between Goebel and Schmid.

## II. Legal Standard

In deciding the present motion to dismiss, this court must accept as true all well-pleaded factual assertions in plaintiffs' complaint and draw all reasonable inferences from those assertions in plaintiffs' favor. *Roth v. United States*, 952 F.2d 611, 613 (1st Cir. 1991) (citation omitted).

 Before a court grants a motion to dismiss for failure to state a claim, ordinarily it must allow an opportunity to amend the complaint, and clarify the factual allegations to satisfy the requirements of a valid legal cause of action, if that can be done consistently with the pleader's obligations under Rule 11 of the Federal Rules of Civil Procedure. *See Wyatt v. City of Boston*, 35 F.3d 13, 14–15 (1st Cir.1994). In this case, however, plaintiffs have had ample opportunity to reconsider and present a perfected complaint. Thus, plaintiffs' Third Amended Complaint (Docket No. 57, filed March 14, 1994), filed after defendant Schmid's motion to dismiss (Docket No. 47, filed March 4, 1994), is properly before the court for consideration on the merits.

Also, plaintiffs have had ample notice that in some form (whether in the amended complaint or in other documents submitted to the court) factual particularity of their claims is required because, to some extent at least, they are claims of a type to which Rule 9(b) applies, and because the court has given notice in conferences on this case that vague statements or claims that might have passed muster under *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), at an earlier stage of proceedings in this case are not sufficient at this advanced stage when the first phase of trial before a jury is imminent.

> *See, e.g., Roth*, 952 F.2d at 613 (at a minimum, plaintiffs are "obliged to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory") (citation and internal quotation marks omitted);

*Feliciano v. DuBois,* 846 F.Supp. 1033, 1042–43 (D.Mass.1994) (imposing particularity-of-claim requirement in case management order even where particularity of complaint is not required).

### III. The Pleading of Claims Against Mr. Schmid

#### A. The Third Amended Complaint

Plaintiffs allege that Mr. Schmid, a Massachusetts citizen, is one of the owners of Schmid, Inc., and that he personally directs and controls all actions of that corporation. Third Amended Complaint ¶ 4. Mr. Zukerman, a citizen of New York, is a business consultant who does business under the name M.E. Zukerman & Co., *id.* at ¶ 5; he is also a director of Schmid, Inc., *id.* at ¶ 33.

On January 5, 1993, Goebel notified Mr. Schmid that Schmid had broken the August 1992 Payments Agreement and verbal promises by Jim Godsill, the Chief Operating Officer of Schmid, to make certain payments. Third Amended Complaint ¶ 24. Goebel, worried about Schmid's financial condition, asked Mr. Schmid for financial information concerning Schmid. *Id.* On January 7, Mr. Godsill informed Goebel that such information would be made available. *Id.* at ¶ 26. Schmid sent the information on January 15, 1993, representing that it set forth Schmid's financial condition for the year ending December 31, 1992. *Id.* at ¶ 27.

An account of relevant subsequent events, as described in the Third Amended Complaint, is set forth below.

¶ 31. On January 23, 1993, Schmid met with Goebel in New York City. The first meeting took place beginning at 10:00 am in a conference room of the St. Regis Hotel and was followed by another meeting at 2:00 pm on January 26, 1993, at Mr. Zukerman's club, which it is believed was the University Club. The participants were Paul Schmid III, James Godsill and Mr. Zukerman, for Schmid and Wilhelm Goebel, Dieter Schneider and Karlheinz Muller, for Goebel.

* * * * *

¶ 33. Mr. Muller told those present that he did not believe that the Schmid financial statements could be correct. He indicated that his calculations and his experience led him to the conclusion that Schmid would have a great loss for 1992 rather than the profit of $1,500,000 shown in the financial figures given to Goebel by Schmid. This poor financial condition of Schmid would have made it impossible for Goebel to have any security for its "loans to Schmid" in the event that the payment schedule was further extended. Mr. Zukerman, who led the discussions for Schmid, as he had since the ARS negotiations in early 1991, took immediate offense. He assured the representatives of Goebel that he was a Director of Schmid, that he has a personal interest in Schmid and that in these capacities he knows the condition of the Company and that "the loss that you [Goebel] are predicting will not occur." He responded further, as he had on other occasions, that nothing bad would happen to Schmid, but if it did, he would arrange for or obtain any necessary capital and that Goebel should trust him. He particularly appealed to Mr. Goebel to trust him. Mr. Zukerman then lectured the Goebel representatives, emphasizing his knowledge and experience with figures and companies as a merger and acquisition consultant and told the Goebel representatives that he was correct. *Goebel accepted and relied upon the express representations and promises of Mr. Zukerman* that the financial statements were accurate and correct, and that the financial condition of the company was such that it would survive and prosper because of his long and close relationship with Schmid and the Schmid family and *because the representations were made in the presence of Mr. Schmid* and Mr. Godsill *who should have been equally well informed as to the financial status of Schmid and who did nothing to indicate that Mr. Zukerman's statements were not absolutely true. Mr. Schmid and Mr. Godsill's silence also led Goebel to believe that Mr. Zukerman was telling the truth* and that the written financial information was true and correct. (Emphasis added).

Goebel alleges that it entered into another Payments Agreement in February 1993 "in

reliance upon the representations made by Zukerman in the presence of Mr. Godsill and Mr. Schmid that the financial information sent to Goebel by Schmid was true and correct." Third Amended Complaint ¶ 36.

Yet, the amended complaint alleges, Zukerman's representations (made to induce Goebel to extend more credit to Schmid, relieve Schmid of its defaults, and execute the February 1993 Payments Agreement) were "false and fraudulent." *Id.* at ¶ 36.

## B. Construction of the Third Amended Complaint

Plaintiffs' statement of their fraud claim against Mr. Schmid apparently encompasses both Mr. Schmid's alleged responsibility for the fraudulent written financial statement and his silence during the course of Mr. Zukerman's oral representations that the written statement was true. I will consider these separately below.

The fraud allegation involves multiple participants. Apart from whatever role Mr. Schmid had with respect to the written financial statements, Mr. Godsill also had a significant role in preparing and producing them. Mr. Schmid's alleged silence in the New York meetings, moreover, is inextricably tied to the alleged misrepresentations made by Mr. Zukerman, and to Mr. Godsill's silence in the face of those misrepresentations.

In one critical respect, plaintiffs' statement of their claim against Mr. Schmid lacks clarity. Are plaintiffs making only a claim of fraud, or are they instead, by inserting in Paragraph 33 of the Third Amended Complaint the phrase, "who should have been equally well informed as to the financial status of Schmid," attempting to state in the alternative a negligent silence claim?

The emphasized passages in Paragraph 33, and the phrase "false and *fraudulent*" (emphasis added) in Paragraph 36, make it clear that plaintiffs are claiming fraud—a tort of which one element is "scienter," a state-of-mind requirement. That is, they allege that Mr. Schmid, at the time the oral representations were made by Mr. Zukerman at the meeting of January 23, 1993, either (1) knew that the facts about the Schmid financial

condition were contrary to the facts as represented by Mr. Zukerman, or (2) knew that he did not know whether the represented facts were true and that Mr. Schmid had a duty to speak and instead remained silent, by reason of which Mr. Schmid's conduct satisfied the "reckless disregard" standard for the tort of fraud.

> *See Pappas v. Harrow Stores,* 140 A.D.2d 501, 504, 528 N.Y.S.2d 404 (1988);

> *see also Kozdras v. Land/Vest Properties, Inc.,* 382 Mass. 34, 41–43, 413 N.E.2d 1105, 1110–11 (1980) (wilful disregard of actual facts).

To avoid any misunderstanding that otherwise might arise later in the proceedings before this court and on appeal, I give notice that I do not interpret the Third Amended Complaint as alleging, even in the alternative, a claim against Mr. Schmid based on alleged negligent failure to speak.

A later part of this Memorandum considers whether a viable claim against Mr. Schmid has been stated for *fraudulent* failure to speak. There, I consider precedents regarding whether a person who knows of the falsity of a representation of fact made by another in that person's presence has a legally enforceable duty to speak. Precedents regarding a duty to speak when one knows of falsity would not be in point, however, if plaintiffs were making a claim of duty to speak because Mr. Schmid allegedly should have known of falsity even if he did not. Indeed, such a claim would invoke a negligence standard ("should have known"), not a fraud standard.

The First Circuit, in a case involving an insurance contract rather than the type of contract involved here, has cautioned against a reading of cases to "create a highly improbable untethered obligation of care." *Town of Allenstown v. National Casualty Co.,* 36 F.3d 229, 234 (1st Cir.1994).

> Even if National Casualty [the defendant] could in some measure be described as "negligent" in this respect—a point we need not decide—the policy imposed no such general duty of care on National Casualty.

Contracts are, after all, specific agreements to take specific steps to accomplish particular results, and those commitments are the central measure of each party's responsibility. With diffidence, the courts have implied or imposed ancillary obligations (such as good faith requirements or implied warranties) in discrete situations. But the unlimited implication of new, free-floating duties is a matter in which courts have to be very careful, lest they undo the bargain struck by the parties.

*Id.* at 13–14. There are at least as strong reasons, if not stronger, for skepticism about any claim of a broad and untethered obligation of care in this case, if such a claim were made. I do not address the issue further because, as stated above, I do not read the Third Amended Complaint as asserting such a claim, even in the alternative.

### IV. The Written Financial Statement

■ Federal Rule of Civil Procedure 9(b) requires plaintiffs to allege fraud with particularity. Since the First Circuit has not approved a corporate group liability doctrine, I conclude that when multiple defendants are involved in cases arising in this circuit, Rule 9(b) requires that fraud be alleged particularly as to each defendant.

> See *Shields v. Amoskeag Bank Shares, Inc.*, 766 F.Supp. 32, 41 (D.N.H.1991), *rev'd in part on other grounds sub nom. Serabian v. Amoskeag Bank Shares*, 24 F.3d 357 (1st Cir.1994);
>
> *Loan v. Federal Deposit Ins. Corp.*, 717 F.Supp. 964, 968 (D.Mass.1989);
>
> *Margaret Hall Foundation v. Atlantic Financial Management, Inc.*, 572 F.Supp. 1475, 1481 (D.Mass.1983).

Plaintiffs have failed to attribute to Mr. Schmid, with the requisite particularity, any allegedly fraudulent misrepresentations contained in the written financial statement.

This conclusion is supported directly by Judge Tauro's opinion in *Loan,* where he held that plaintiffs in a § 10(b) cause of action failed to meet Rule 9(b)'s particularity requirement. Plaintiff based his cause of action on an allegedly false and misleading Subscription Offering Circular distributed by the corporation of which defendants were officers and directors. The complaint alleged that "'the defendants caused [the Subscription Offering Circular] to be prepared and circulated.'" 717 F.Supp. at 968. No individual defendant was "alleged to have actually prepared, signed or even read the Circular before it was issued." *Id.*

In the case at bar, the closest and only connection that plaintiffs draw between Mr. Schmid and the preparation and production of the written financial statement is that Goebel "requested Mr. Schmid to give it financial information concerning Schmid." Third Amended Complaint ¶ 24. Just as in *Loan,* there is no allegation that Mr. Schmid prepared, signed, or even read the statement. Rather, it is Mr. Godsill who told Goebel that the requested financials would be forthcoming. Third Amended Complaint ¶ 26. Moreover, it is "Schmid"—by which the amended complaint, as drafted, means the business entities, rather than Paul Schmid individually—that allegedly sent the written financial information to Goebel. Third Amended Complaint ¶ 27. Goebel's Third Amended Complaint is therefore insufficient to support a claim of fraud against Mr. Schmid based on the financial statement.

Both parties rely on *Hurley v. F.D.I.C.,* 719 F.Supp. 27 (D.Mass.1989). In *Hurley,* defendant bank officer's status alone was sufficient to create a duty to disclose material facts about his bank's lending operations in reports to the F.D.I.C. *Id.* at 32–33. The defendant was directly responsible for supervising the bank's lending operations; thus, he was liable even though he did not sign the misleading statements. *Id.* Mr. Schmid, it may be assumed in plaintiff's favor, was by virtue of his status both responsible for and familiar with the financial condition of the businesses known as Schmid. Thus, under *Hurley,* he would bear responsibility for representations about Schmid's financial health in "annual reports ... and other group-published information." *Id.* at 33 (internal citation and quotations omitted).

The financial statement at issue in this case, however, is not of that type. It was not group-published, nor was it produced as a

report responsive to some government regulation, as in *Hurley*. It was produced in response to a specific request by Goebel for such information. It can reasonably be inferred from the fact that Mr. Schmid fielded Goebel's request for the information that Mr. Schmid was aware that Mr. Godsill was preparing a financial statement for Goebel. To conclude that this alone is sufficient to support an inference that Mr. Schmid was aware of the contents of the report would be tantamount to imposing a duty of disclosure on higher corporate officers and directors for all papers prepared and distributed to outsiders by subordinate officials. To impose such a duty, as plaintiffs urge, would eviscerate a requirement recognized by the First Circuit more than a decade ago. The requirement is that there be "some showing of direct personal involvement by the corporate officer in some decision or action which is causally related to plaintiff's injury." *See Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir.1980).

## V. Schmid's Silence at the New York Meeting

In addition to Mr. Schmid's alleged responsibility for the fraudulent financial statements, plaintiffs base their claim on Mr. Schmid's silence at the New York meetings.

Mr. Schmid's silence derives its significance, if any, from the content of Mr. Zukerman's representations, which can be divided into two categories. The first consists of the "express representations and promises of Mr. Zukerman that the financial statements were accurate and correct." Third Amended Complaint ¶ 33. The second category consists of Mr. Zukerman's assurances that "nothing bad would happen to Schmid" and that the company would "survive and prosper." *Id.* I analyze Mr. Schmid's silence with respect to each category in turn, assuming, but not deciding, that he had a duty of disclosure.

### A. Mr. Schmid's Silence Regarding Mr. Zukerman's Representations About the Written Financial Statements

#### 1. Particularity as to Scienter

■ The allegation of Mr. Schmid's silence in the face of Mr. Zukerman's representa-

tions regarding the truth of the written financial statements does not state a claim for fraudulent misrepresentation because scienter is not alleged with the requisite particularity. It is true that intent or knowledge need be averred only generally. Fed. R.Civ.P. 9(b). At least in this Circuit, however, plaintiff must set forth specific facts that make it reasonable to infer that defendant knew that a statement was materially false or misleading. *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992). Some supporting facts must be alleged to support this inference even when the fraud relates to matters peculiarly within the knowledge of the opposing party. *Wayne Investment v. Gulf Oil Corp.*, 739 F.2d 11, 14 (1st Cir.1984).

As explained above, plaintiffs fail to allege any facts to support a reasoned inference that Mr. Schmid knew that Mr. Zukerman's representations regarding the written financial statements were false. There is no allegation that he read the statements, nor that anyone communicated their content to him. Indeed, there is no allegation that any participant in the New York meeting discussed the allegedly fraudulent content of the financial statements in Schmid's presence. Thus, even if Mr. Schmid, based on his status in Schmid, knew that the business had suffered a great loss in 1992, there is no allegation that he knew the written financial statements to contradict his knowledge.

■ It is true that, under Massachusetts law, a statement of fact that is susceptible of actual knowledge, if made as of one's knowledge, will support a claim for deceit. *See, e.g., Kozdras v. Land/Vest Properties, Inc.*, 382 Mass. 34, 43, 413 N.E.2d 1105, 1111 (1980). The contents of the financial statements were susceptible of actual knowledge by Mr. Schmid in that he could have read them with little difficulty. But as there is no allegation that he did read them, his silence cannot be construed as a "statement" of fact or as a representation. For this reason, the cases cited by plaintiffs are inapposite. For example, in *Frontier Management Co., Inc. v. Balboa Ins. Co.*, 658 F.Supp. 987, 992 (D.Mass.1986), defendants were alleged to have made representations that their books

were sound. Similarly, defendants in *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass.1985), and *Frederick v. Conagra, Inc.*, 713 F.Supp. 41, 46 (D.Mass.1989), were alleged to have made explicit, false representations. Mr. Schmid's silence, in contrast, was not a representation regarding something about which he could have obtained actual knowledge, because it was not a representation at all.

Plaintiffs contend that the Supreme Court's recent decision in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), casts considerable doubt on the continuing validity of the First Circuit's pleading requirements. Interpreting Federal Rules of Civil Procedure 8 and 9, the Court held that a heightened pleading requirement could not be imposed in a civil rights action, filed under 42 U.S.C. § 1983, against a municipality. *Id.* at —— ——, 113 S.Ct. at 1161–63. The Court did not suggest that existing Rule 9(b) jurisprudence, as it applies to allegations of fraud, should be reconsidered. Moreover, even if I were to conclude that *Leatherman* relaxed pleading requirements for one or more of the claims of plaintiffs in this case, the point remains that vague statements or claims that might have passed muster under *Leatherman* at an earlier stage of proceedings are not sufficient at this advanced stage when the first phase of trial before a jury is imminent.

### 2. Massachusetts Statute of Frauds

I conclude that, for a second and independent reason, plaintiffs' fraud claim against Mr. Schmid must be dismissed.

Even if the Third Amended Complaint stated a claim for fraud against Mr. Schmid with sufficient particularity, defendant contends that the claim would be barred by the Massachusetts Statute of Frauds, according to which,

> No action shall be brought to charge a person upon or by reason of a representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance is made in writing and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized.

M.G.L. c. 259 § 4.

Because New York has no comparable statute, I turn first to the question whether I should apply New York or Massachusetts law. I do not consider the possibility of applying the law of any other jurisdiction because neither party has suggested that possibility at any stage of the proceedings.

#### a. Choice of Law

 Since subject matter jurisdiction in this action is founded on diversity, the court must follow the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Massachusetts conflicts law therefore governs.

The Supreme Judicial Court has announced that it will follow a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole."

> *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985) (contract);
> *see also Cosme v. Whitin Machine Works, Inc.*, 417 Mass. 643, 632 N.E.2d 832 (1994) (tort).

Massachusetts courts consider choice-of-law issues by assessing various choice-influencing considerations, including those provided in the *Restatement (Second) of Conflict of Laws* (1971), and those suggested by various commentators. *Cosme*, 632 N.E.2d at 834.

Contrary to the assumption made by the plaintiffs in this case, a Massachusetts court would not decide the choice of law issue before this court by mechanically applying Section 148 of the *Restatement*. That section does apply specifically to actions in fraudulent misrepresentation. The Supreme Judicial Court, however, has emphasized the choice-influencing factors of Section 6 rather than the specific choice of law rules of the *Restatement*. *See Bushkin*, 473 N.E.2d at 668–70. I therefore view Section 148 as providing only a starting point for the court's

analysis, not the exclusive criterion of decision.

Plaintiffs contend that Section 148(1) rather than Section 148(2) applies to this case. Section 148(1), however, is limited to the situation where plaintiff's action in reliance occurs *exclusively* in the state in which the misrepresentations were made and received. *See* comment d. Narrowly viewed, plaintiffs' action in alleged reliance on Mr. Schmid's silence was their entry into the February 1993 payments agreement; yet, plaintiffs do not allege in their Third Amended Complaint the location of the signing of this agreement. In any event, plaintiffs' alleged reliance may be viewed more broadly to include all actions inherent in continuing their business relationship with Schmid, not just the decision itself to continue the relationship. These actions can be traced to New York (where Goebel may have made its decision to continue the relationship), Germany (where Goebel manufactured the Hummel figurines for sale to Schmid), and Massachusetts (where Goebel sold the figurines to Schmid). It is appropriate to make an analysis under Section 148(2), which governs multi-jurisdictional reliance.

Section 148(2) calls for application of the law of the state with the "most significant relationship" to the events and the parties.

Two of the factors listed in that section are either indecisive or simply inapplicable. The first factor concerns the places where the plaintiff acted in reliance on defendant's representations or, as in this case, defendant's silence. As just noted, these places include Massachusetts, New York, and Germany. The fifth factor—the place where the tangible thing that is the subject of the transaction between the parties was situated at the time—has no bearing on the choice-of-law question posed here.

Two factors point toward the application of Massachusetts law. The fourth factor is the place of business, incorporation, domicil, or residence of the parties. The Goebel entities are a German corporation and a German partnership with principal places of business in Germany. Mr. Schmid lives and works in Massachusetts. The sixth factor—the place where the plaintiff is to render performance under a contract that it has been induced to enter by false representations of defendant—suggests Massachusetts and Germany as relevant jurisdictions, but not New York.

The second and third factors—the places where the representations were first communicated to the plaintiff, and the place where defendant made the false representations—favor application of New York law, as that is where Mr. Schmid was silent.

Thus, "simply adding up various contacts," *Bushkin,* 473 N.E.2d at 669, does not decide whether New York or Massachusetts is the state with the "more significant relationship" to the transaction or parties. *See id.* 473 N.E.2d at 669–70. As in *Bushkin,* "[n]o simple and objective test can provide an acceptable choice-of-law answer in this case, nor should it." *Id.* 473 N.E.2d at 670. Therefore, following the lead of the Supreme Judicial Court in *Bushkin* and *Cosme,* I turn to the choice-influencing factors of Section 6 for a more probing analysis that takes into account the interests of the parties, the forums, and the legal system overall.

The first of these factors concerns the needs of the interstate and international systems. Perhaps, as a general proposition, effectively exempting American businessmen from liability for their fraudulent oral statements regarding their corporations' creditworthiness would threaten this country's strong trade ties with foreign nations. Where a foreign corporation has been doing business in one state for over half a century, though, its government is unlikely to be offended by application of the settled law of that state to controversies involving the foreign corporation.

The second, third, and fifth factors are the relevant policies of the forum; the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; and the basic policies underlying the particular field of law. Although the SJC has not adopted Professor Currie's governmental interest analysis, as Judge Harrington observed in *Alves v. Siegel's Broadway Auto Parts, Inc.,* 710 F.Supp. 864, 871 n. 5 (D.Mass.1989), the SJC has shown particular concern with policy

and interest factors when it has applied Section 6. *See Cosme,* 632 N.E.2d at 835–36, *Bushkin,* 473 N.E.2d at 670–71; *but cf. Emery Corp. v. Century Bancorp., Inc.,* 588 F.Supp. 15, 19 (D.Mass.1984) (basing decision on "stronger interest" of Massachusetts and applying Section 6 factors as "[o]ther considerations").

The SJC has observed that the policy behind the Statute of Frauds provision at issue is protection against "the danger of injustice from allowing a disappointed creditor to charge a defendant with the debt due him from a third person by parol testimony of a fraudulent representation as to the solvency of that third person." *Cauman v. Biggar,* 251 Mass. 91, 91, 146 N.E. 230 (1925). That is, the SJC has considered it inappropriate to hold a person liable for the debts of a third person, even a corporation of which he is an important officer, solely on the basis of evidence of his oral representations of that person's creditworthiness.

A Massachusetts forum does not have the same decisive interest in applying the Massachusetts Statute of Frauds that it has in applying a state procedural rule because the Statute of Frauds "involves a question of substantive law." *See Bushkin,* 473 N.E.2d at 671 (internal citations omitted). On the other hand, "the Statute of Frauds concerns the necessary proof of a case and not the substantive merits of a plaintiff's claim." *Id.* It is sometimes described as "a rule of evidence affecting the remedy." *See Campbell v. Sheraton Corp. of America,* 363 Mo. 688, 253 S.W.2d 106, 109 (1952) (describing Missouri Statute of Frauds). A state has a legitimate interest not only in protecting alleged promisors, but also in protecting the integrity of its legal process by " 'limiting the possibilities of perjury' and 'avoiding unseemly disputes' as to what sort of assurances or promises may have been made." *See Tenna Mfg. Co. v. Columbia Union Nat. Bank,* 484 F.Supp. 1214, 1219 (W.D.Mo.1980) (quoting 1 *Restatement of Conflict of Laws 2d* § 141, p. 392) (construing purposes of Missouri Statute of Frauds).

Massachusetts and New York share a common policy of seeking to prevent fraud. One might conclude that "[t]he fact that [they] have come to opposite conclusions concerning the best way of accomplishing this goal largely cancels this factor out of the equation." *See Emery Corp.,* 588 F.Supp. at 19. I conclude, however, that this line of reasoning shortchanges Section 6, which calls not just for enumeration of state policies in the abstract but for evaluating states' respective interests in applying those policies in the particular case.

Yet, even after giving New York the benefit of this evaluation, I conclude that New York's interest falls short of matching Massachusetts' interest in applying its Statute of Frauds in this instance. New York has a general interest, it is true, in seeing that fraud is not committed in commercial transactions that take place within its boundaries; however, New York has no interest comparable to that of Massachusetts since plaintiffs have made no showing that the scope of their business in New York is comparable to that of Mr. Schmid in Massachusetts.

The fourth factor, the protection of justified expectations, also militates in favor of applying Massachusetts law. Goebel had conducted business with Schmid, a Massachusetts corporation with principal place of business in Massachusetts, for over half a century. Indeed, Goebel has sued Schmid in Massachusetts rather than in New York. Furthermore, plaintiffs have not alleged any contacts with New York that would justifiably create in plaintiffs an expectation that they would benefit from a New York common law or statutory remedy for fraud in the circumstances of this case. It is true that the location of the alleged fraud by Mr. Schmid in New York is not "purely adventitious," *see Reisch v. McGuigan,* 745 F.Supp. 56, 62 (D.Mass.1990), or mere "happenstance," *see Saharceski v. Marcure,* 373 Mass. 304, 311–12, 366 N.E.2d 1245, 1249 (Mass.1977). It can reasonably be inferred from the Third Amended Complaint that the meeting was held there because of the contacts that Mr. Zukerman, Schmid's consultant and a New York resident, has with New York City. Nevertheless, there is no showing of any extent to which Schmid and Goebel had ever conducted their business in New York in the past.

That neither party could justifiably expect that law other than that of Massachusetts would apply to controversies between them means that the elements of the sixth factor—considerations of certainty, predictability, and uniformity—also weigh in favor of applying Massachusetts law. Parties should be able to plan their transaction as one with predictable results. Robert A. Leflar, et al., *American Conflicts Law* 290 (4th ed. 1986). Where parties have consistently based their relationship in certain jurisdictions, to apply the law of another jurisdiction only because they step into that jurisdiction for a time and reason incidental rather than central to the long history of their relationship would upset their ability to transact with predictable results.

The seventh factor of Section 6 of the *Restatement* does not favor application of either Massachusetts or New York law. No difference appears as to the difficulty of interpreting and applying New York and Massachusetts law.

Finally, I consider a factor that is not a part of Restatement Section 6 but nonetheless merits attention because the SJC has indicated explicitly that it will consider choice-influencing factors proposed by various commentators. *See Cosme,* 632 N.E.2d at 834. Professor Leflar proposes that the court consider which forum supplies the better rule of law. *See* Leflar, *supra,* at 297. The forum judge may find its law anachronistic, for example. *Id.* at 298–99. Plaintiffs no doubt view the Statute of Frauds provision at issue in this case as anachronistic, or even downright unfair. It is true that Massachusetts is one of only three states to enforce such a provision as strictly as it does. *See Brock and Davis Co., Inc. v. Charleston Nat. Bank,* 443 F.Supp. 1175, 1179 (S.D.W.Va. 1977). If there were any indication that the Massachusetts courts were relaxing their construction and application of the creditworthiness provision, this would militate against its application to a case involving a foreign plaintiff. As far as I can determine, however, there is no such indication. *See id.*

In sum, Massachusetts has a significantly stronger interest in applying its law than does New York. Also, the other choice influencing factors suggest that I should apply Massachusetts law. I conclude that a Massachusetts court would find that the creditworthiness provision of the Statute of Frauds should apply in this case.

### b. Application of Statute of Frauds

▮▮▮▮ Application of the Statute of Frauds to this case is straightforward. It is well settled that the statute encompasses the situation in which a corporate officer makes representations to a third party about the creditworthiness of the corporation. *Hunnewell v. Duxbury,* 157 Mass. 1, 6, 31 N.E. 700 (1892). Thus, even if Mr. Schmid's silence in the face of Mr. Zukermans' representation that the written financial statement was true and accurate were held to constitute a representation that Schmid was financially sound, Mr. Schmid's silence would be well within the protective bounds of the statute.

Plaintiffs' attempts to create exceptions to the Statute of Frauds are to no avail because they are without any support in the precedents. First, the cases concerning estoppel apply only to that provision of the Statute of Frauds that forbids enforcement of an oral contract that is not to be performed within one year, and not to the creditworthiness provision. Second, the cases in which courts have declined to apply the Statute of Frauds because the defendant owed fiduciary duties to the plaintiff are inapposite because no such duty exists in this instance. Third, the SJC has flatly rejected a personal benefit exception. *See Middlesex County National Bank v. Redd Auto Sales,* 336 Mass. 727, 731, 147 N.E.2d 790, 792 (1958). Finally, no cited cases support the claim that Massachusetts courts have created an exception for fraudulent misrepresentation; indeed, such an exception would eviscerate the Statute of Frauds.

### B. Mr. Schmid's Silence Regarding Mr. Zukerman's Representations About the Future Condition of Schmid

▮▮▮▮ The second category of statements by Mr. Zukerman consists of Mr. Zukerman's assurances that "nothing bad would happen to Schmid, but if it did, he would arrange for or obtain any necessary capital

and that Goebel should trust him," and that the company would "survive and prosper." Third Amended Complaint ¶ 33. The claim that Mr. Schmid's silence in the face of these statements was fraudulent is insufficient as a matter of law.

The claim is insufficient because Mr. Zukerman's statements are not statements or representations of material fact. To reach this conclusion, I need not decide whether New York or Massachusetts law applies, as there is no relevant conflict. Statements of opinion, judgment, hope, or expectation relating to future events are generally not actionable under Massachusetts or New York law.

> *See, e.g., Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1199 (D.Mass.1990);
>
> *Powell v. Rasmussen*, 355 Mass. 117, 118, 243 N.E.2d 167, 168 (1969);
>
> *Newman v. Silver*, 553 F.Supp. 485, 497–98 (S.D.N.Y.1982), *aff'd in part and vacated in part*, 713 F.2d 14 (2d Cir.1983);
>
> *Quasha v. Am. Natural Beverage Corp.*, [171 A.D.2d 537] 567 N.Y.S.2d 257, 257 (1991).

There are qualifications and exceptions to this rule. For example, such statements are actionable in either state where one misrepresents one's actual present intent to perform a future act.

> *See Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 152, 190 N.E.2d 867 (1963);
>
> *Jones Memorial Trust v. Tsai Investment Services, Inc.*, 367 F.Supp. 491, 499 (S.D.N.Y.1973).

Also, Massachusetts has recognized an exception to the general rule where the parties have unequal knowledge of the subject matter and where the future event is fully within the declarant's control. *Logan Equipment Corp.*, 736 F.Supp. at 1200.

The statements of Mr. Zukerman do not constitute representations of material facts because they are merely promises or predictions. This conclusion is apparent from their very face. Moreover, neither of the possible exceptions applies to the statements in question. There is no hint in the pleadings that Mr. Zukerman misrepresented his present intent to secure capital for Schmid should the

company experience financial difficulties. Nor was the survival and prosperity of Schmid within Mr. Zukerman's exclusive control. It follows a fortiori that if Mr. Zukerman's statements of opinion and judgment are not actionable, then neither is Mr. Schmid's silence in the face of such statements.

### ORDER

For the foregoing reasons, it is hereby ORDERED:

The motion of defendant Paul A. Schmid III to dismiss the claim for fraudulent misrepresentation in the Third Amended Complaint (Docket No. 47) is allowed. The claim is dismissed with prejudice.