**ST. PAUL FIRE AND MARINE IN-SURANCE COMPANY, as Subro-gee of Vicam, L.P., Plaintiff,**

**v.**

**BIRCH, STEWART, KOLASCH & BIRCH, LLP, Leonard R. Svensson, Bernard L. Sweeney, Defendants.**

No. CIV.A.2001–10327–RBC.[1]

United States District Court,
D. Massachusetts.

Nov. 25, 2002.

1. With the parties' consent, on December 6, 2001, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Lisa A. Furnald, Robins, Kaplan, Miller & Ciresi, LLP, Boston, MA, Thomas J. Conlin, Bruce A. Finzen, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, for Plaintiff.

William L. Boesch, Sugarman, Rogers, Barshak & Cohen, Boston, MA, David A. Barry, Warren E. Zirkle, McGuire Woods LLP, McLean, VA, for Defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS *(# 30)*

COLLINGS, United States Magistrate Judge.

### I.  INTRODUCTION

On January 15, 2001, defendant Birch, Stewart, Kolasch & Birch LLP ("BSKB"),

Leonard R. Svensson ("Svensson") and Bernard I. Sweeney ("Sweeney") filed a Motion to Dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. (# 30) and a memorandum in support thereof (# 31), contending that the action should be dismissed because, as a matter of law, an insurer has no standing as a subrogee to sue for legal malpractice. Defendants' motion presents and relies upon matters outside the pleadings, set forth in a separate Statement of Undisputed Material Facts (# 32), and therefore defendants sought to have their motion treated as a summary judgment motion under Rule 56, Fed.R.Civ.P. Plaintiff St. Paul Fire and Marine Insurance Company, as Subrogee of Vicam, L.P. ("St. Paul"), filed Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment Based on Choice of Law (# 37) and Plaintiff's Undisputed Material Facts, and Its Statement in Response to Defendants' Statement of Undisputed Material Facts (# 40). Defendants' motion (# 30) is in a posture for resolution.

### II.  THE FACTS

For purposes of the instant motion, the material facts do not seem to be in dispute. Rather, the legal conclusion to be drawn from the facts forms the basis of the parties' disagreement on the law which is to govern the litigation.

BSKB is a law firm based in Virginia. Complaint (# 1) ¶ 2. Svensson is an attorney licensed to practice law in Virginia and California. # 1 ¶ 7. At all times relevant to this matter, Svensson was based in BSKB's Virginia office. Defendants' Statement of Undisputed Material Facts (# 32) ¶ 2.[2] Sweeney is an attorney licensed to practice law in Massachusetts.

---

**2.** Citations are to the Defendants' Statement of Undisputed Material Facts (# 32) and the Plaintiff's Undisputed Material Facts, and Its Statement in Response to Defendants' State- ment of Undisputed Material Facts (# 40), rather than to the affidavits and other foundational documents submitted with those documents.

#1 ¶8. Although admitted to numerous federal jurisdictions, Sweeney is not admitted to any state bar other than Massachusetts. #32 ¶3. Sweeney is also based in BSKB's Virginia office. #32 ¶3. At all relevant times, Vicam L.P. ("Vicam") was a company organized in Delaware and located in Watertown, Massachusetts. #1 ¶1. Svensson, Sweeney, and through them, the law firm of BSKB, served as counsel to Vicam with respect to certain matters, including patent infringement. #1 ¶¶6, 16; #32 ¶4, Plaintiff's Undisputed Materials [sic] Facts, and Its Statement In Response to Defendants' Statement of Undisputed Material Facts (#40) ¶2. During the years of BSKB's representation of Vicam, BSKB attorneys regularly engaged in mail, telephonic and electronic communications with Vicam employees in Massachusetts and periodically attended meetings in Massachusetts. #40 ¶3.

Vicam was the exclusive licensee of two patents relating to the detection of aflatoxins. #1 ¶9. Beginning in February 1995, Vicam learned that Neogen Corporation ("Neogen") was developing a product which might infringe Vicam's patents. #1 ¶12. Vicam's President consulted with Svensson to discuss its concerns about Neogen's product and obtain legal advice by telephone and facsimile about the matter. #1 ¶15; #32 ¶¶5–11. On the recommendation of BSKB, Vicam faxed from Massachusetts a letter dated August 12, 1996 ("Dear Valued Customer Letter") to its customers, stating essentially that Neogen's new product infringed Vicam's patents and threatening to take legal action against any infringers. #1 ¶¶19, 20; #32 ¶¶10, 11; #40 ¶¶9, 10, 13.

Svensson had suggested the language which should be contained in the letter. #32 ¶10; #40 ¶10. Vicam personnel prepared a first draft of the letter, and thereafter, various drafts were exchanged during the day on August 12, 1996. #40 ¶10. After this exchange, Svensson "...faxed a letter to Vicam in Massachusetts setting forth a final version of the letter he proposed to be sent to Vicam customers." #40 ¶10. Svensson did not advise anyone at Vicam that such a letter could trigger a lawsuit by Neogen, or of any other risks of sending it. #40 ¶¶11, 15, Exh. F.

On or about August 16, 1996, Neogen sued Vicam and its President and Chief Executive Officer, Jack Radlo ("Radlo"), in the United States District Court for the Western District of Michigan, alleging trade libel, tortious interference with potential advantageous business relationships, and tortious interference with contractual relationships. #1 ¶21. Sweeney represented Vicam and Radlo in the Michigan lawsuit, which was dismissed for lack of personal jurisdiction over the defendants. #1 ¶¶22, 23. Neogen then sued Vicam and Radlo in the United States District Court for the Middle District of Florida (the "Florida Lawsuit"). #1 ¶24. Neogen alleged in its Second Amended Complaint filed in the Florida Lawsuit claims of corporate defamation, product disparagement/trade libel, tortious interference with advantageous business relationships/expectancies, tortious interference with contractual business relationships, and common law unfair competition, and sought a declaratory judgment that its product does not infringe Vicam's patents and/or that Vicam's patents are invalid. #1 ¶24; #40 ¶16.

St. Paul is a Minnesota corporation with a principal place of business in Minnesota. #1 ¶1. St. Paul issued a comprehensive general liability insurance policy to Vicam. #1 ¶27. Pursuant to the policy and an agreement with Vicam, St. Paul paid one-half of the attorneys' fees and costs incurred by Vicam in the Florida Lawsuit. #1 ¶27. St. Paul agreed to defend Radlo

and Vicam in the Florida Lawsuit under a reservation of rights, and referred the matter to a Florida attorney, J. Scott Murphy ("Murphy"). # 32 ¶ 12. At Vicam's and Murphy's request, BSKB and Sweeney also represented Vicam and Radlo in the Florida Lawsuit. # 1 ¶ 26; # 32 ¶ 13; # 40 ¶ 17. Sweeney was admitted pro hac vice in the Florida court to defend the Florida Lawsuit. # 32 ¶ 15.

Sweeney's (and BSKB's) legal services in connection with the Florida Lawsuit included regular contact with Vicam employees in Massachusetts by phone, facsimile and e-mail. # 40 ¶ 19. Sweeney filed a "Declaration" in support of a motion by Vicam to have the case transferred to Massachusetts pursuant to 28 U.S.C. § 1404(a). # 40, Exh. P. In the pleading, Sweeney pointed out that the majority of documents and witnesses were in Massachusetts and that the caseload and the time for disposing of cases was less in the District of Massachusetts than in the Middle District of Florida. # 40, Exh. P.

Parts of discovery in the Florida Lawsuit took place in Michigan, Massachusetts, Illinois, Georgia, Florida and by telephone from Virginia to Texas and South Dakota. # 32 ¶ 17. During the pendency of the Florida Lawsuit, there were numerous telephone communications between Sweeney in Virginia and Vicam in Massachusetts. # 32 ¶ 18. Sweeney and a colleague from BSKB made numerous visits to Massachusetts to meet with Vicam representatives about the Florida Lawsuit. # 32 ¶ 18; # 40 ¶ 19.

The question of whether there could be discovery of what Svensson advised Vicam regarding sending the Dear Valued Customer Letter or whether Vicam would assert an attorney-client privilege was first raised in Radlo's deposition on November 17, 1997 in Boston. # 40 ¶ 21. In that deposition, Sweeney instructed Radlo not to answer any questions respecting discus-

sions he had had with Vicam's attorneys which led to the conclusion that Neogen had infringed Vicam's patents. # 40, Exh. M. Specifically, the following colloquy took place:

Q. August 12, '96 you write the letter, the "Dear Valued Customer" letter. Why didn't you file your claim for infringement then?

MR. SWEENEY: I will caution you at this time not to get into matters discussed between you and counsel in answering that question.

# 40, Exh. M.

On the advice and instruction of Sweeney, at various points during the Florida Lawsuit Vicam and Radlo asserted the attorney-client privilege to prevent discovery concerning the advice given by BSKB regarding infringement and the Dear Valued Customer Letter. # 1 ¶ 2; # 40 ¶¶ 20, 21. In June 1998, Sweeney stated at a hearing in Florida that Vicam and Radlo did not intend to present evidence at trial of opinions Svensson had given in August 1996 regarding infringement. # 32 ¶¶ 19, 20.

Radlo avers that:

On numerous occasions I requested Mr. Sweeney to get Mr. Svensson involved in the case as a witness since he had both prosecuted the patents involved, and given us his advice and opinion that the Neogen product infringed together with the opinion that we should send the Dear Valued Customer letter to clients. Mr. Sweeney refused, saying that it was against Birch Stewart firm policy to have lawyers testify as witnesses in cases.

\*      \*      \*      \*      \*      \*

Neither Mr. Sweeney nor anyone else from Birch Stewart discussed with me what the significance would be of my waiving or not waiving the attorney-

client privilege during my deposition in Massachusetts.

# 40, Exh. 1, ¶¶ 27, 28.

On or about January 27, 2000, the trial court in the Florida Lawsuit entered judgment in favor of Neogen on infringement, finding that Neogen's product does not infringe Vicam's patents. # 1 ¶ 34. In March 2000, trial commenced in the Florida Lawsuit with respect to the remaining claims. # 1 ¶ 35. On the second day of trial, March 28, 2000, acting on the advice of Sweeney, Vicam and Radlo agreed to pay Neogen $2,000,020 in settlement of the Florida Lawsuit. # 1 ¶ 36; # 32 ¶ 23; # 40 ¶ 25. St. Paul provided the policy limits of two million dollars. # 40 ¶ 25. St. Paul also paid half of more than $1.8 million of BSKB's total fees billed in the litigation. # 40 ¶ 25.

Subsequently, St. Paul learned that BSKB and Vicam were negotiating in an effort to settle Vicam's claims that BSKB had been negligent in representing it in the Florida Lawsuit. # 40 ¶ 26. Eventually Vicam and BSKB agreed to settle Vicam's claims separately from any claims St. Paul may have and the settlement was embodied in a Settlement Agreement and Mutual Release. # 40 ¶ 26, Exh. J. At St. Paul's request, Vicam expressly waived the attorney-client privilege with respect to BSKB/Vicam communications, and expressly consented to St. Paul proceeding against BSKB in a separate lawsuit. # 40 ¶ 26, Exh. J, K, L. St. Paul signed the Settlement Agreement. # 40 ¶ 26, Exh. J.

St. Paul initiated this action as subrogee of Vicam, seeking to recover the amount it paid BSKB and the amount it paid Neogen in settlement. # 1 ¶ 38. St. Paul contends that Svensson, Sweeney and BSKB were negligent in their advice to Vicam concerning infringement, the Dear Valued Customer Letter, and in advising Vicam and Radlo to assert the attorney-client privi-

lege in connection with the Florida Lawsuit. # 1 ¶¶ 43, 48.

## III. DISCUSSION—A CONFLICT OF LAWS AND ITS RESOLUTION

### A. Applicable Law

There is a difference between Massachusetts law and Virginia and Florida law with respect to whether legal malpractice claims may be pursued by a subrogee. *National Union Fire Ins. Co. v. Salter*, 717 So.2d 141, 143 (Fla. 5th DCA 1998), review denied, 727 So.2d 908 (Fla.1999) (Under Florida law, subrogation of legal malpractice claims will not be enforced); *Washington v. Fireman's Fund Ins. Co.*, 459 So.2d 1148, 1149 (Fla. 4th DCA 1984) (Under Florida law, assignments of legal malpractice claims will not be enforced); *New Hampshire Ins. Co. v. McCann*, 429 Mass. 202, 203, 207 n. 4, 707 N.E.2d 332, 332, 335 n. 4 (1999) (Under Massachusetts law, voluntary assignments of legal malpractice claims will be enforced but court left open question of whether involuntary assignment of such claims would be enforced); *MNC Credit Corp. v. Sickels*, 255 Va. 314, 318, 497 S.E.2d 331, 333 (1998) (Under Virginia law, assignment of legal malpractice claims will not be enforced).

In a diversity action such as this, the Court must apply the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Massachusetts conflicts law requires the Court to follow a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985); *see also Cosme v. Whitin Machine Works, Inc.*, 417 Mass. 643, 646, 632 N.E.2d 832, 834 (1994). "Massachusetts courts consid-

er choice-of-law issues by assessing various choice-influencing considerations, including those provided in the Restatement (Second) of Conflict of Laws (1971), and those suggested by various commentators." *Goebel v. Schmid Bros., Inc.*, 871 F.Supp. 68, 75 (D.Mass.1994) (citing *Cosme*, 417 Mass. at 646, 632 N.E.2d at 834).

Section 145 of the Restatement (Second) of Conflict of Laws "provides the general principle 'applicable to all torts and to all issues in tort.'" *Cosme*, 417 Mass. at 646, 632 N.E.2d at 834.[3] That section states as follows:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Restatement (Second) of Conflict of Laws] s 6.

(2) Contacts to be taken into account in applying the principles of s 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971).

As noted in Section 145, the Court also must consider the "choice influencing factors" found in Section 6(2) of the Restatement (Second) of Conflict of Laws when analyzing a choice-of-law issue. See *Goebel*, 871 F.Supp. at 76 (citing *Cosme*, 417 Mass. at 647 n. 6, 632 N.E.2d at 835 n. 6 and *Bushkin*, 393 Mass. at 634, 473 N.E.2d at 670). Section 6(2) provides as follows:

The factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative inter-

---

**3.** Although St. Paul asserts negligence claims, Massachusetts courts have held that legal malpractice claims do not sound exclusively in either contract or tort. *See Clark v. Rowe*, 428 Mass. 339, 341, 701 N.E.2d 624, 626 (1998). The Restatement (Second) of Conflict of Laws § 196 governs contracts for the rendition of services. It provides as follows:

[t]he validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services ... be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in s 6 to the transaction and the parties, in which the [sic] event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 196 (1971).

There is no contract between the parties to this case, St. Paul and BSKB. The parties have not produced any document indicating that the contract for legal services between BSKB and Vicam specified where those services would be performed. The substantive question before the Court—whether St. Paul as subrogee of Vicam may assert legal malpractice claims against BSKB—does not concern the validity of the contract for legal services between BSKB and Vicam or either party's rights under that contract. *See McCoubrey v. Kellogg, Krebs & Moran*, 7 Fed. Appx. 215, 2001 WL 326709 at *3 (4th Cir. 2001) (legal malpractice claim sounds in tort if the attorney performs a task negligently and sounds in contract if the attorney accepts a fee but fails to perform service). Accordingly, section 196 does not assist the Court in determining which state's law governs St. Paul's claims.

ests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).[4]

## B. Applying the Section 145 Restatement Factors [5]

■ Applying the Section 145 factors to the facts of this case does not weigh overwhelmingly in favor of one state as the state with the most significant connection to the parties and the occurrences at issue, but, on balance, it is my view that Massachusetts has the most significant connection.

With respect to factor (a), St. Paul's injury (payments to BSKB and the settlement payment to Neogen) occurred at its offices in Minnesota and Vicam's injury occurred at its offices in Massachusetts. # 1 ¶ 1; # 40 ¶ 25.

As for factor (b), the place where the conduct causing the injury occurred is Massachusetts and Virginia. With respect to the advice respecting the Dear Valued Customer Letter, the decision by the attorneys as to what advice to give was made in Virginia, but the pertinent conduct occurred in Massachusetts where the advice was given to the client. There would have been no injury had the advice been formulated in Virginia but never given to the client. In my judgment, the conduct giving rise to the injury was the act of giving the allegedly faulty advice to Vicam in Massachusetts. # 32 ¶¶ 9–11; # 40 ¶¶ 9, 11, 14, 15. The other incident of BSKB's alleged negligence, failing to advise Vicam to assert an advice of counsel defense, took place first in Massachusetts when Sweeney instructed Radlo not to answer questions relative to his actions in sending the Dear Valued Customer letter since the answer to the questions would have necessarily revealed counsel's advice. Again, while the decision to advise the client not to waive the attorney-client privilege and assert an advice of counsel defense may have been made at BSKB's offices in Virginia, the advice was communicated to Vicam in Massachusetts. The assertion of the privilege also took place at a hearing in Florida, when the attorney-client privilege was asserted and during depositions taken in places including Massachusetts. # 40 ¶ 21; # 32 ¶¶ 16, 17, 19, 20.

**4.** Courts may also consider choice-influencing factors proposed by various commentators. See *Goebel*, 871 F.Supp. at 78 (considering which forum supplies the better rule of law); *Bushkin*, 393 Mass. at 634, 473 N.E.2d at 670 (considering five considerations proposed by Professor R.A. Leflar in American Conflicts Law at 195 (3d ed.1977), as follows: "(A) Predictability of results; (B) Maintenance of interstate and international order; (C) Simplification of the judicial task; (D) Advancement of the forum's governmental interests; (E) Application of the better rule of law."). 

**5.** St. Paul, suing in its capacity as subrogee of Vicam, "stands in the shoes" of Vicam. *Liberty Mut. Ins. Co. v. National Consolidated Warehouses, Inc.*, 34 Mass.App.Ct. 293, 297, 609 N.E.2d 1243, 1246 (1993) (citing *Harvard Trust Co. v. Racheotes*, 337 Mass. 73, 75, 147 N.E.2d 817, 818 (1958)); see also *Centreville Car Care. Inc. v. North American Mortgage Co.*, 263 Va. 339, 345, 559 S.E.2d 870, 872 (2002) ("Subrogation not being a matter of strict right, but purely equitable in nature, dependent upon the facts and circumstances of each particular case, no general rule can be laid down which will afford a test in all cases for its application."). In its conflict of laws analysis, the Court will consider not only the parties' connections to the various interested states but also Vicam's connections to those states. See *Forest Ins., Ltd. v. American Motorists Ins. Co.*, 1994 WL 97138 at *7 (S.D.N.Y.1994) (considering contacts of nonparty insured in conflict of laws analysis concerning claims brought by insurers).

Analysis of factor (c) does not clearly indicate any one state: St. Paul is a Minnesota corporation located in Minnesota; BSKB is registered and located in Virginia; and Vicam is a Delaware corporation located in Massachusetts. # 1 ¶¶ 1, 2. Svensson is admitted to practice law in Virginia and California; Sweeney is admitted to practice law in Massachusetts.

Finally, applying factor (d) of Section 145, there is no one state which is clearly the center of the relationship (if any) between St. Paul and BSKB. St. Paul's only relationship with BSKB is through its issuance of an insurance policy to Vicam, a Delaware corporation located in Massachusetts, and through the Florida Lawsuit. # 1 ¶ 1; # 32 ¶¶ 12, 13. Accordingly, to the extent St. Paul and BSKB had a relationship, it appears not to have been centered in any one state but to have included contacts in Minnesota, where St. Paul is located and paid BSKB and Neogen; in Massachusetts, where Vicam is located, where it received advice from BSKB and where some of the depositions in the Florida Lawsuit took place; in Virginia, where BSKB was located and performed or failed to perform many of its allegedly negligent acts; and in Florida, the site of the Florida Lawsuit. # 1 ¶¶ 1, 2, 24; # 40 ¶ 25; # 32 ¶ 16.

As to Vicam and BSKB, the legal advice which is alleged to amount to malpractice was formulated in Virginia and given to Vicam, the client, in Massachusetts. The actions taken in reliance on the advice occurred in Massachusetts (sending the letter to Neogen; asserting the attorney-client privilege at Radlo's deposition) and in Florida (stating that Vicam would not rely on an advice-of-counsel defense).

" 'Simply adding up various contacts' " does not determine which state has the most significant relationship to the transaction or parties. *Goebel*, 871 F.Supp. at 76 (quoting *Bushkin*, 393 Mass. at 632, 473

N.E.2d at 669). As set forth in the Restatement (Second) of Conflict of Laws § 145(2)(d), "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue.." Or, as the Third Circuit has phrased the proposition, "[t]he factors...should be evaluated on a qualitative rather than a quantitative basis." *David B. Lilly Co., Inc. v. Fisher*, 18 F.3d 1112, 1119 (3rd Cir.1994) citing *The Travelers Indemnity Co. v. Lake*, 594 A.2d 38, 48 n. 6 (Del.Supr.1991).

The phrase "issue in tort" in Section 145 refers to the "occurrence" or occurrences which are alleged to establish liability under the tort law. In this case, those occurrences would be BSKB's acts which Vicam and St. Paul claim amount to legal malpractice. The Court must determine which state "has the most significant relationship" to those occurrences.

As noted, BSBK's alleged malpractice is based on the providing of bad legal advice to its client. BSKB argues strenuously that because that advice was formulated at its offices in Virginia and it communicated the advice (for the most part) to Vicam from its offices in Virginia, Virginia has the most significant relationship to the case. As BSKB phrases it, Virginia is where the legal services were "performed." See # 31, pp. 14–15. I disagree.

First, as I indicated, supra, when the alleged act of malpractice is one of providing legal advice, the act is "performed" when the advice is received by the client. This is especially so in the situation which pertains in the instant case. The advice respecting the Dear Valued Customer Letter was received by the client in Massachusetts and the client acted on that advice in Massachusetts, the place from which the client sent the letter. The advice respecting the need to assert the attorney-client privilege (with the consequence that an

advice of counsel defense would not be interposed) was communicated to the client in Massachusetts, and, so far as appears, the first assertion of the privilege in the Florida litigation occurred in Massachusetts at Radlo's deposition.

Therefore, I find that "the place where the conduct causing the injury occurred" is primarily in Massachusetts and only secondarily in Florida where the Court was informed that the "advice of counsel" defense would not be advanced. Vicam's injury occurred in Massachusetts where, as the result of the malpractice, it would have to dispense funds. Therefore, the first two "contacts" which Section 145(2) instructs be "taken into account", i.e., (a) and (b), weigh heavily toward Massachusetts. The third factor, i.e., (c), is neutral as between Virginia and Massachusetts. The fourth factor, i.e., (d), "the place where the relationship . . . between the parties is centered," is more or less neutral. It appears that BSKB had been providing legal advice to Vicam with respect to Patent Matters over an extended period of time. To the extent that the great majority of the advices or services provided directly involved proceedings before the Patent Office in Virginia, the relationship as a whole might be said to be centered in Virginia, but the acts of malpractice alleged in the instant case did not involve the Patent Office.

So applying the factors on a "qualitative basis", I find that factors (a) and (b) weigh more heavily and this finding results in the conclusion that with respect to the allegations of malpractice by Vicam against BSKB, Massachusetts "has the most significant relationship to the occurrence and the parties".

### C. Applying Restatement Section 6 Factors (a), (d), (f) and (g)

Next, the Court "turn[s] to the choice-influencing factors of Section 6 for a more probing analysis that takes into account the interests of the parties, the forums, and the legal system overall." *Goebel*, 871 F.Supp. at 76. In this case, factor (a) (the needs of the interstate and international systems) does not point strongly in any particular direction. Factor (f) (certainty, predictability and uniformity of result) weighs in favor of applying Massachusetts law to the extent that doing so promotes uniformity of results by holding out of state attorneys practicing in Massachusetts and giving advice to Massachusetts clients to the same standards as in-state attorneys practicing there. On the other hand, BSKB could not reasonably expect that Virginia malpractice law would be applied uniformly to all cases in which it provided legal services or advice to out-of-state clients.

Factor (d) of Section 6 (the protection of justified expectations) is not particularly relevant as between Vicam and BSKB since the parties were unlikely to consider ahead of time where a malpractice claim would be brought. See Restatement (Second) of Conflict of Laws § 6, comment g ("There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question.").

However, to the extent St. Paul's conduct at the time of Vicam's settlement with BSKB is relevant, the Court finds this factor weighs in favor of applying Massachusetts law, because it can be assumed that St. Paul would not have agreed to Vicam's settlement with BSKB (including the provisions separating out St. Paul's claims against BSKB) if it believed that by so doing, it was extinguishing its subrogation rights. # 40 ¶ 26; # 32, Exh. J. It is a

fair inference that St. Paul had an expectation that Massachusetts law would apply.

### D. *Applying Restatement Section 6 Factors (b), (c), (e) and (g)*

The Court therefore focuses its analysis on Section 6's factors (b) (the relevant policies of the forum), (c) (the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue) and (e) (the basic policies underlying the particular field of law). The Court must consider the basic policies underlying the law of legal malpractice generally, including states' desires to compensate the victims of legal malpractice, and the policies underlying Massachusetts, Virginia, Florida and Minnesota's law with respect to permitting or precluding the involuntary assignment of legal malpractice claims, and the relative interest of each state in the determination of this particular issue.

Although each of the states involved in these events has an interest in compensating victims of legal malpractice, only Minnesota has an interest in compensating St. Paul, a Minnesota corporation located in Minnesota. # 1 ¶ 1; see also *Lilly*, 18 F.3d at 1119 (basic policy underlying an action for professional negligence is to compensate the victim). Given that Minnesota's only connection with this matter is as the home state of the plaintiff, the Court finds it is not the state with the most significant relationship to the parties and occurrences. Similarly, although Florida was the site of the Florida Lawsuit and the hearing at which Sweeney allegedly negligently failed to assert an advice of counsel defense on behalf of Vicam, the Court finds Florida's interest in resolving this dispute between St. Paul, a Minnesota entity, and BSKB, a Virginia entity, relatively attenuated and remote. See # 32

¶ 20. Accordingly, the remainder of this analysis respecting application of the factors delineated in § 6(b)(c) and (e) will be limited to a comparison of the parties' and the occurrences' connections with Massachusetts and Virginia.[6]

First, with respect to malpractice law, Virginia has a strong interest in protecting the important relationship between clients and attorneys practicing in Virginia. See, e.g., *MNC Credit Corp.*, 255 Va. at 319, 497 S.E.2d at 334. That interest is weakened in this factual situation, however, for several reasons: 1) only one defendant, Svensson, is admitted to the Virginia bar, although BSKB's offices are located in Virginia; 2) Vicam, BSKB's client, has waived the attorney/client privilege to permit St. Paul to pursue its claims against BSKB; and 3) the Vicam/BSKB relationship has already been damaged by BSKB's alleged negligence. See # 32 ¶¶ 1, 2; # 40 ¶ 26; see also *New Hampshire Ins. Co.*, 429 Mass. at 208, 707 N.E.2d at 336 (" 'Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected.' ") (quoting *Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 526, 539 A.2d 357, 359 (1988)). On the other hand, Massachusetts has a strong interest in protecting Massachusetts residents from malpractice by out-of-state attorneys practicing in the Commonwealth. *Santos v. Sacks*, 697 F.Supp. 275, 283 (E.D.La.1988); *Lilly*, 18 F.3d at 1120. In these circumstances, were it just a question of which state's malpractice law would apply, the answer would be that Massachusetts law would be applicable.

However, there is the second aspect— the different policies of the states with respect to allowing subrogation of legal malpractice claims. Virginia has ex-

---

**6.** To the extent the law of Florida is the same as that of Virginia with respect to the involuntary assignment of legal malpractice claims, they may be considered one jurisdiction for conflicts analysis. See Restatement (Second) of Conflict of Laws § 145(2), comment i.

pressed a strong interest in prohibiting assignments of legal malpractice claims (at least voluntary assignments) in order to maintain the integrity of the judicial process by not creating a commodity market for trading of malpractice claims.[7] See, e.g., *MNC Credit Corp.*, 255 Va. at 318–319, 497 S.E.2d at 333–334. These policies must be respected and weighed in the conflicts analysis. Courts barring assignment of malpractice claims, including Virginia courts, have based their decisions on public policies including "the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship ...." See, e.g., *Goodley*, 62 Cal. App.3d 389, 397, 133 Cal.Rptr. 83 (1976). They have also expressed concern that permitting the assignment of legal malpractice claims could

> relegate the legal malpractice action to the market place and convert it to a

commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights.... The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system. restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley*, 62 Cal.App.3d at 397, 133 Cal. Rptr. 83.

Massachusetts has a different policy which permits voluntary assignment of legal malpractice claims, allows parties to

7. The majority of courts which have considered whether legal malpractice claims may be assigned have refused to permit those assignments on public policy grounds. *See, e.g., Botma v. Huser*, 202 Ariz. 14, 39 P.3d 538, 542 (2002); *Goodley v. Wank and Wank, Inc.*, 62 Cal.App.3d 389, 395, 133 Cal.Rptr. 83, 86–87 (1976); *Roberts v. Holland & Hart*, 857 P.2d 492, 496 (Colo.Ct.App., 1993); *Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves*, 709 F.Supp. 44, 50 (D.Conn.1989) (Connecticut law); *Washington*, 459 So.2d at 1149 (Florida law); *Brocato v. Prairie State Farmers Ins. Ass'n*, 166 Ill.App.3d 986, 988–989, 520 N.E.2d 1200, 1201, 117 Ill.Dec. 849, 850 (1988); *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 341 (1991); *Bank IV Wichita, Nat'l Ass'n v. Arn, Mullins, Unruh, Kuhn & Wilson*, 250 Kan. 490, 499, 827 P.2d 758, 765 (1992); *Coffey v. Jefferson County Bd. of Educ.*, 756 S.W.2d 155, 157 (Ky.Ct.App.1988); *Joos v. Drillock*, 127 Mich.App. 99, 105, 338 N.W.2d 736, 739 (1983); *Wagener v. McDonald*, 509 N.W.2d 188, 191 (Minn.App. 1993); *Scarlett v. Barnes*, 121 B.R. 578, (W.D.Mo.1990) (Missouri law); *Earth Science Labs., Inc. v. Adkins & Wondra, P.C.*, 246 Neb. 798, 802, 523 N.W.2d 254, 257 (1994); *Chaf-*

*fee v. Smith*, 98 Nev. 222, 223–224, 645 P.2d 966, 966 (1982); *Alcman Servs. Corp. v. Samuel H. Bullock, P.C.*, 925 F.Supp. 252, 258 (D.N.J.1996), *aff'd*, 124 F.3d 185 (3d Cir., 1997) (New Jersey law); *Can Do, Inc. Pension and Profit Sharing Plan and Successor Plans v. Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865, 869 (Tenn.), *cert. denied*, 519 U.S. 929, 117 S.Ct. 298, 136 L.Ed.2d 216 (1996); *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 316 (Tex.App.—San Antonio 1994); *MNC Credit Corp.*, 255 Va. at 318, 497 S.E.2d at 333. *Contra Richter v. Analex Corp.*, 940 F.Supp. 353, 358 (D.D.C.1996); *Thurston v. Continental Casualty Co.*, 567 A.2d 922, 923 (Me.1989); *New Hampshire Ins. Co.*, 429 Mass. at 209, 707 N.E.2d at 336; *Vitale v. City of New York*, 183 A.D.2d 502, 503, 583 N.Y.S.2d 445, 446 (1st Dep't 1992); *Collins v. Fitzwater*, 277 Or. 401, 409, 560 P.2d 1074, 1078 (1977), *overruled on other grounds by Lancaster v. Royal Ins. Co.*, 302 Or. 62, 71, 726 P.2d 371, 376 (1986); *Hedlund Mfg. Co.*, 517 Pa. at 526, 539 A.2d at 359. *See also* Francis M. Dougherty, Annotation, *Assignability of claim for legal malpractice*, 1985 WL 287577, 40 A.L.R.4th 684 (1985).

decide who has the time and the resources to sue on such a claim, and does not shield attorneys in cases where the loss sought is purely economic and there is no threat to the attorney's duty of loyalty or confidentiality to the client. See *New Hampshire Ins. Co.*, 429 Mass. at 209–210, 707 N.E.2d at 336. The Massachusetts Supreme Judicial Court has rejected the idea that permitting assignment of legal malpractice claims would result in commodity trading in those claims, stating that such a specter "is based in part on outmoded concepts and protectionism." *New Hampshire Ins. Co.*, 429 Mass. at 210, 707 N.E.2d at 337. Under Massachusetts public policy, permitting voluntary assignment of legal malpractice claims does not demean public confidence in the legal profession, but refusing to enforce such assignments and thereby sheltering attorneys from malpractice claims may do just that. See *New Hampshire Ins. Co.*, 429 Mass. at 211, 707 N.E.2d at 337. St. Paul also points out that applying Virginia law to bar its claims offends Massachusetts public policy of promoting settlements, because it effectively requires the insured to litigate rather than settle with its allegedly negligent attorney to preserve its insurer's rights. See *Medical Malpractice Joint Underwriting Ass'n of Mass. v. Goldberg*, 425 Mass. 46, 61 n. 34, 680 N.E.2d 1121, 1130 n. 34 (1997) (citing *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 765, 610 N.E.2d 912, 922 (1993)) (Massachusetts public policy favors settlements).

This case involves involuntary assignment by subrogation of a legal malpractice claim. Although the Massachusetts Supreme Judicial Court has permitted voluntary assignments of legal malpractice claims, it expressly acknowledged that involuntary assignments "may be more likely to implicate public policy concerns." *New Hampshire Ins. Co.*, 429 Mass. at 207 n. 4, 707 N.E.2d at 335 n. 4. As noted in New Hampshire Insurance Company,

"[s]even of the cases examined from the jurisdictions that have concluded that malpractice claims should not be assigned involved an involuntary assignment of a malpractice claim, typically by way of bankruptcy or foreclosure." *New Hampshire Ins. Co.*, 429 Mass. at 207 n. 4, 707 N.E.2d at 335 n. 4.

St. Paul contends that this case involves "the functional equivalent of a voluntary assignment," and that permitting it to assert legal malpractice claims as subrogee will not offend the public policies relied on by Goodley and its progeny. See # 37 at 12. St. Paul notes the following in support of its position: 1) it is not a stranger to the situation, but was involved in the Florida Lawsuit from which the malpractice claims arose; 2) the settlement agreement between Vicam and BSKB expressly contemplates St. Paul pursuing claims against BSKB as subrogee, and 3) Vicam has waived the attorney-client privilege with respect to its communications with BSKB such that allowing St. Paul to proceed does not threaten BSKB's duty of loyalty or confidentiality to its clients. See *Atlanta Int'l Ins. Co. v. Bell*, 438 Mich. 512, 521, 475 N.W.2d 294, 297 (1991) (using the doctrine of "equitable subrogation" to permit an insurer to assert legal malpractice claim against insured's attorneys in part because "[i]n such cases the attorney-client relationship, the interests of the client, the interest of the insurer, and ultimately the public, which otherwise would absorb the costs of the malpractice, all benefit from exposure to suit.")

Although the Court agrees that these are significant distinctions, the fact remains that St. Paul is not a party to the attorney-client relationship between Vicam and BSKB and permitting it to assert legal malpractice claims against BSKB is allowing a non-client to bring a legal malpractice claim against an attorney. Other

courts examining the issue have found public policy concerns implicated by involuntary assignment by subrogation of legal malpractice claims. *See Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg,* 30 Cal.App.4th 1373, 1384, 36 Cal.Rptr.2d 424, 430 (1994) ("although 'subrogation and assignment have certain technical differences, each operates to transfer from one person to another a cause of action against a third, and the reasons of policy which make certain causes of action nonassignable would seem to operate as forcefully against the transfer of such causes of action by subrogation.'") (quoting *Fifield Manor v. Finston,* 54 Cal.2d 632, 640, 354 P.2d 1073, 1077, 7 Cal.Rptr. 377, 382 (1960)); *Bank IV Wichita, Nat'l Ass'n,* 250 Kan. at 502, 827 P.2d at 766 ("We hold that the policy considerations prohibiting the assignment of legal malpractice claims also prohibit the subrogation of a debtor's legal malpractice claim against the debtor's attorney by a creditor where the interests of the debtor and the creditor have the potential to diverge."); *National Union Fire Ins. Co.,* 717 So.2d at 143 ("We find that the same public policy reasons apply and prohibit the subrogation of a legal malpractice claim.").

However, at this stage of the proceedings, the Court does not propose to decide whether, if faced with the question, the Supreme Judicial Court of Massachusetts would permit the type of assignment which occurred in this case. To determine that issue, the Court might have to certify the question to that court. In these circumstances, factor (g), (the ease in the determination of the law to be applied) would lean in favor of applying Virginia law where the issue appears to have been decided.

Having explored factor (b) (the relevant policies of the forum), part of factor (c) (the relevant policies of other interested states), factor (e) (the basic policies underlying the particular field of law) and having determined, as per factor (g) that Virginia law is easier to "determine" than Massachusetts on the facts of this case, the Court must examine the other aspect of factor (c), i.e., the relevant interests of the forum state and other interested states "...in the determination of the particular issue." Restatement (Second) of Conflict of Laws, § 6(2)(c). The "particular issue" is the subrogation of legal malpractice claims.

Massachusetts has an interest in applying its policy on this issue to the relationship between insurance companies doing business in the Commonwealth and Massachusetts' insureds. Virginia has an interest in applying its policy to malpractice claims against attorneys who are residents in Virginia and licensed to practice law in Virginia. Looking at just the "particular issue"—whether legal malpractice claims can be subrogated, the Court cannot conclude that either Massachusetts or Virginia has the stronger interest.

So of the Section 6 factors, (a), (b), (c) and (e) are neutral as between Massachusetts and Virginia. Factors (d) and (f) favor Massachusetts, and factor (g) favors Virginia. In these circumstances, it is the Court's judgment that the issue of what law applies should be decided by reference back to the factors listed in Section 145, which, as previously noted, point to Massachusetts as having the most significant relationship to the occurrences—the acts which allegedly give rise to liability in tort. In short, Massachusetts law with respect to subrogation applies in the situation in which the adjudication of the claim to be subrogated is governed by Massachusetts law, at least on the facts of this case.

## IV. ORDER

For all the reasons stated, it is ORDERED that Defendants' Motion to Dis-

miss (# 30) on the ground that some law other than that of Massachusetts applies to the question of whether a claim of legal malpractice can be subrogated be, and the same hereby is, DENIED.